Filed 4/8/22  P. v. McMorries CA2/4

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>SHELDON McMORRIES, et al.,<br><br>    Defendants and Appellants. | B289194<br><br>(Los Angeles County Super. Ct. No. NA 091954)<br><br><br>ORDER MODIFYING OPINION (NO CHANGE IN JUDGMENT) |

THE COURT:*

The opinion filed March 9, 2022, in the above-entitled matter is ordered MODIFIED as follows:

Add the following paragraph at the end of the discussion on page 43:

"Lopez argues unreliable evidence does not become reliable simply because its admission does not violate *Crawford*; rather,

the admission of such evidence can constitute a violation of the due process clause of the Fourteenth Amendment. This argument lacks merit. State law error in admitting evidence does not violate due process unless the error renders defendant's trial fundamentally unfair. (*People v. Partida* (2005) 37 Cal.4th 439, 439.) As we have rejected Lopez's arguments concerning the admission of this evidence under state law principles and found no error and no prejudice, we reject this contention as well."

This modification does not change the judgment.

The petition for rehearing is DENIED.

WILLHITE, Acting P.J.          COLLINS, J.          CURREY, J.

Filed 3/9/22  P. v. McMorries CA2/4 (unmodified opinion)

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>SHELDON MCMORRIES et al.,<br><br>Defendants and Appellants. | B289194<br><br>(Los Angeles County Super. Ct. No. NA091954) |

APPEAL from a Judgment of the Superior Court of Los Angeles County, Laura L. Laesecke, Judge. Affirmed as modified with directions.

Corona & Peabody and Jennifer Peabody, under appointment by the Court of Appeal, for Defendant and Appellant Sheldon McMorries.

Janyce Keiko Imata Blair, under appointment by the Court of Appeal, for Defendant and Appellant David Solorio.

Ralph H. Goldsen, under appointment by the Court of Appeal, for Defendant and Appellant Ronald Lopez.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Idan Ivri, Steven E. Mercer and Noah P. Hill, Deputy Attorneys General, for Plaintiff and Respondent.

_____

In a 19-count indictment, the prosecution jointly charged Appellants Sheldon McMorries, David Solorio and Ronald Lopez with the murder of William "Tiny" Knight and other offenses, including attempted murder, conspiracy, and extortion. Appellants were tried jointly before a single jury. The jury found them guilty of the first-degree murder of Knight and convicted them as charged on all other counts.

Appellants now challenge the sufficiency of the evidence supporting a number of their convictions and contend the trial court erroneously: declined to sever McMorries' trial, admitted prejudicial expert testimony on the meaning of gang code, committed instructional error, and failed to grant their motions for mistrial. They also request we review the trial court's in-camera *Pitchess* evaluation and correct the abstracts of judgment to delete certain fines and fees, or remand for a hearing on their ability to pay the fines and fees pursuant to *People v. Duenas* (2019) 30 Cal.App.5th 1157. In supplemental briefs, Appellants also contend the Senate Bill 775 (2021-2022 Reg. Sess.) amendments to Penal Code section 1170.95 permit their challenge to the jury instructions regarding natural and probable consequences to be raised on direct appeal. Finally, McMorries requests in a supplemental brief that we strike his five-year enhancements under section 667.5, subdivision (b). We affirm.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A.    Introduction.

The prosecution contended the three appellants were part of a Mexican Mafia crew working for Emiliano "Tonito" Lopez, an inmate incarcerated at Pelican Bay State Prison. Appellant Lopez, Tonito's brother, was the crew chief. Solorio was a "camarada" who served as appellant Lopez's assistant. McMorries, along with others, was an enforcer or "tax" collector who extorted "rent" or "tax" money from gangs operating in areas controlled by Tonito's crew and turned the money over to Lopez and Solorio. Under the direction of Lopez and Solorio, McMorries shot and killed Knight on July 5, 2010, because Knight, who also was extorting rent or tax money from gangs on behalf of the crew, failed to turn the money over to Lopez or Solorio. The prosecution also contended appellants Lopez and Solorio conspired to have two county jail inmates, James Arellano and Daniel Bugarin, killed for breaking Mexican Mafia rules.

Trial evidence consisted primarily of recordings of intercepted phone calls; audio recordings from body wires worn by informants; text messages; interpretation by gang experts of language used in the calls, conversations, and text messages; cell phone triangulation; surveillance; and McMorries' confession to an informant.

After summarizing the information, we summarize the relevant trial evidence concerning the Mexican Mafia and the shooting of Knight. Additional facts relevant to particular legal issues are discussed later in the opinion in connection with our analysis of those issues. We also defer discussion of facts relating to the other crimes with which only Solorio and Lopez were charged (conspiracy to commit murder, the attempted murders of

Arellano and Bugarin, and the extortion counts) until later in the opinion.

## B.    Information

The second amended information, filed May 22, 2017, alleged as follows against the three appellants[1]:

| Count | Section | Offense | Date | Defendant | Victim |
|-------|---------|---------|------|-----------|--------|
| 1 | 187 | Murder | 7/5/10 | All | William Knight |
| 2 | 182/187 | Conspiracy to Commit Murder | 7/5/10 | All | William Knight |
| 3 | 182/518/ 519 | Conspiracy to Commit Extortion | 6/29/10 to 8/20/11 | All | Ovidio Salazar |
| 4 | 518 | Extortion | 10/31/10 to 12/13/10 | Lopez | Carmelo Pizzaro |
| 5 | 519 | Extortion by Threat | 9/21/10 to 12/13/50 | Solorio, Lopez | Vincent Lugo |
| 6 | 519 | Extortion by Threat | 11/2/10 to 12/13/10 | Lopez | Robert Abeyta |
| 7 | 519 | Extortion by Threat | 11/2/10 to 12/13/10 | Lopez | Alex Medrano |
| 8 | 518 | Extortion | 11/3/10 to 11/22/10 | Lopez | Arnulfo Chavez |

---

[1]    Section references in the following chart, and throughout this opinion, are to the Penal Code, unless otherwise indicated.

4

| 9 | 519 | Extortion by Threat | 11/7/10 to 12/22/10 | Lopez | Jerome Saucedo |
|----|------|-----|-----|-----|-----|
| 10 | 519 | Extortion by Threat | 12/8/10 to 12/13/10 | Lopez | Mario Munoz |
| 11 | 519 | Extortion by Threat | 12/9/10 to 12/13/10 | Lopez | Manuel Gomez |
| 12 | 519 | Extortion by Threat | 19/2/10 to 8/20/11 | Solorio, Lopez | Eduardo Gonzalez |
| 13 | 12021, subd. (a)(1) | Felon in Possession | 7/11/11 | McMorries | N/A |
| 14 | 29800, subd. (a)(1) | Felon in Possession | 4/12/12 | Lopez | N/A |
| 15 | H&S 11379, subd. (a) | Sale/Offer for Sale Controlled Substance | 4/12/12 | Solorio | N/A |
| 16 | 187/664 | Attempted Murder | 4/7/10 to 4/14/12 | Solorio, Lopez | James Arellano |
| 17 | 182/187 | Conspiracy to Commit Murder | 4/7/10 to 4/14/12 | Solorio, Lopez | James Arellano |
| 18 | 664/187 | Attempted Murder | 1/18/09 to 2/14/09 | Solorio, Lopez | Daniel Bugarin |
| 19 | 182/187 | Conspiracy to Commit Murder | 1/18/09 to 2/14/09 | Solorio, Lopez | Daniel Bugarin |

The information further alleged Counts 1 through 12 and 15 through 19 were committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)).

###     C.      Overview of the Mexican Mafia.

At trial, Francis Hardiman, a gang expert with the Los Angeles County Sheriff's Department, testified about the Mexican Mafia's structure and function.

According to Hardiman, the Mexican Mafia, or Eme (Spanish for the letter M), was first organized in the 1950s in state prisons. Originally, the Mexican Mafia operated only in prisons, but beginning in the 1990s, it extended its reach outside to the County jails and into the streets. The Mexican Mafia sent paroled members as emissaries to the street gangs to tell them their criminal activities fell under the Mexican Mafia's control, and the gangs would have to pay the Mexican Mafia "taxes" if they wanted to commit crimes in those areas. Moreover, the Mexican Mafia would force local street gangs to sell the Mexican Mafia's drugs. If taxes were not paid by a street gang, when its members came to prison, they would be given the "green light" (ordered killed) by the Mexican Mafia. Also, people who failed to pay taxes or skimmed taxes collected might have a "green light" put on them to send a message to other street gang members.

The Mexican Mafia employs a hierarchical structure. The highest level consists of the 150 to 200 actual "members." Most of the members of the Mexican Mafia are serving life terms and rely on others on the outside to commit crimes for the organization. Below the members are "camaradas" and "secretaries" who work directly with the members. The bottom tier level consists of soldiers ("Surenos," or "South Siders"). A camaradas, as a second-

tier Mexican Mafia associate, works closely with a Mexican Mafia member.

On a local level, gang members tax individuals in a specific area under the direction of a crew chief. Collections are made from those engaging in criminal activity in the neighborhood. Generally, an incarcerated member would give orders to a second-tier gang member, who in turn would carry the message to a crew chief. The crew chief would delegate to his crew.

### D.    Tonito's Crew.

As noted above, appellant Lopez is Tonito's younger brother and was Tonito's second in command. McMorries (nicknamed "Goofy") had tattoos signifying membership in the Mexican Mafia, as did Solorio (nicknamed "Blackie") and Lopez (nicknamed "Dave"). Solorio and Lopez were camaradas, while McMorries was a soldier. Tonito's crew collected taxes at the beginning of each month.

Lisa Robles was Tonito's girlfriend. In approximately 2007 she met appellant Lopez. Robles began to collect taxes in Newhall and sent the money to Lopez. She met Solorio in 2008 through Tonito, and conveyed messages from Lopez and Solorio to Tonito. They also spoke about Mexican Mafia business.

Tonito told Solorio that Solorio was a "camarada." Tonito gave Solorio the authority to handle problems he had with someone. "You . . . handle it however you think you need to handle it, but don't let nobody know about it. Just deal with it."

Solorio put Ovidio Salazar (nicknamed "Flaco") in charge of collecting taxes in 2009, and Salazar reported to Solorio and Lopez. Salazar, who had started as a member of the Garden View Locos gang, collected taxes in Bell Gardens, Pasadena, and the Harbor area. He delivered the taxes to Lopez. Salazar began

working for Lopez in May 2009, after a stay in prison. Sometime in 2010, Lopez appointed Knight the tax collector for the Harbor area.

Michael Franco (nicknamed "Boxer") collected taxes for Tonito from 2002 to 2007. Franco delivered taxes to and reported to Lopez. Franco testified at trial that local Hispanic gangs could agree with the Mexican Mafia to pay taxes, in exchange for which the local gang could use "13" in its name and expect the Mexican Mafia to enforce the gang's right to sell drugs in its territory.

Franco also testified there were rules within the Mexican Mafia about killing local gang members for not turning over collected taxes. The "big homie" or top Mexican Mafia member, would need to authorize any killing and would only do so with the proper "paperwork," namely, evidence establishing a rules violation. In the case of a snitch, the paperwork would include any type of police report, or a court transcript showing cooperation with law enforcement.

According to Franco, if taxes were not paid, people could end up paying a lot of money, or they could lose their car, their house, or their life. About 90 percent of collectors skimmed, but few were disciplined. Merely skimming would not warrant severe punishment. Tonito's crew did not like to kill people because it would attract the attention of law enforcement.

### E. Local Activities of Mexican Mafia: Investigation.

A task force consisting of local police agencies and federal agents from the Department of Homeland Security began investigating the Mexican Mafia in the Bell Gardens area. In 2006, Detective Dano Neslen of the Bell Gardens Police Department used informants, surveillance, and recordings of

prison phone calls in his investigation. Detectives wiretapped approximately 16 phones over the course of the investigation. In gang cases, phones often are switched or "flipped" to evade detection.

Neslen obtained wiretaps and learned appellants were working as part of Tonito's crew. As a result of listening to many hours of wiretaps, Detective Neslen could identify the appellants' voices.

Salazar was initially the subject of the wiretaps but later became an informant.[2] Salazar was released from jail in June 2010 and wore a wire when he met with all appellants from October 18, 2010, to approximately September 19, 2011.

During 2008 through 2010, Detective Neslen listened to Tonito's phone calls with Mexican Mafia members. In 2009, he intercepted voice and text messages on Lopez's and Solorio's phones.

### E. Events Leading to the Shooting of Knight.

#### 1. *Knight Fails to Turn Over Tax Collections.*

The victim William Knight was a tax collector for Tonito. In 2010, Knight was put in charge of tax collecting for the Harbor area. Knight had not turned over his collections for at least a month before his July 2010 murder.

Detective Neslen heard conversations between victim Knight and Solorio regarding taxes. Knight also spoke to McMorries.

---

2   Salazar was recruited by Neslen as an informant in 2010 when Salazar had legal problems. Salazar was paid $11,500 for his work.

In May 2010, Solorio told Knight that Salazar was in custody. Knight and Solorio spoke regarding Knight's failure to deliver tax money. To explain the shortfall, Knight informed Solorio the $2,000 he had collected for the month was taken by police when he was arrested. Knight planned to pick up three neighborhoods the next month, and he was going to have each neighborhood contribute an additional $100 to make up the shortfall.

2. *The Crew Discusses Knight.*

In late June 2010, Solorio told Lopez he had not been able to reach Knight on his phone. A few days later, Knight told Solorio he had lost his phones. Knight told Solorio that "I got it still" and "the next one is already coming up," which referred to June and July taxes. Solorio told Knight they were "over here asking for it" and "we're both asking for it, homie." Neslen believed this referred to the late June taxes, and that both Solorio and Lopez were looking for Knight's tax collection.

On June 29, 2010, Solorio called Knight and questioned him about the tax money. Knight responded that he "gotta live too." Solorio responded that Knight should consider stepping down. Knight complained that a lot of people were being arrested, and he received a visit from "Fox," who threatened him based on a drug debt unrelated to the Mexican Mafia. Knight sent a text message to Solorio telling him he was not stepping down. According to Neslen, Knight always had an excuse for failing to turn over the taxes. Neslen believed Knight was not skimming but simply not turning over the money.

Solorio called Lopez and told him to contact Knight. Lopez responded that he would call Knight and pick up the taxes. Solorio gave Lopez Knight's phone number.

10

Knight called Robles and asked for help because he was in trouble with Solorio and Lopez. Robles responded that she would talk to them and try to work out a payment plan. Robles spoke to Solorio and asked what Knight could do to rectify the situation. Solorio said Knight was "through" and she should not talk to him anymore. Robles believed this meant Knight was going to be killed.

On June 30, McMorries asked whether Knight had turned over any money. McMorries told Solorio that Knight had been told over and over to turn over the money but had not done so. McMorries was aware that Knight had been asking for an extra $100. According to Neslen, Knight was going against the rules.

Solorio told McMorries to contact people paying taxes to Knight to let them know there would be a change. Solorio and McMorries agreed to meet later that day. McMorries told Solorio he was "more than willing." Neslen believed that because Solorio had told McMorries it was a "wrap," Knight was going to be killed. Neslen made arrangements to have Knight detained.

On July 1, 2010, McMorries told Solorio that Knight had called him and asked for money. Lopez and Solorio then spoke on the phone and Lopez told Solorio they needed to talk about what McMorries had told him the previous day.

On July 3, 2010, McMorries called Solorio to tell him "everything's cool" and that Knight "was confident" he was cool. Neslen believed this meant that McMorries was trying to make Knight comfortable so that he could use the element of surprise to facilitate killing Knight.

Neslen testified that on July 4, 2010, Solorio used the terminology "that's a wrap" to describe a "green light" on an inmate in prison. Several days later, the inmate was stabbed.

### D. July 5, 2010, Killing of Knight

Early in the afternoon of July 5, 2010, McMorries and Solorio met at a Carl's Junior in Monterey Park Officers followed Solorio to the Carl's Junior. After Solorio and McMorries left the Carl's Junior, officers followed McMorries to his house but stopped the surveillance because McMorries lived on a cul de sac. Officers attempted to find Knight.

On July 5, 2010, at 10:19 p.m., police responded to a "shots fired" call. Knight's body was found next to his car on 219th Street in Torrance. Police recovered Knight's phone and six .45 caliber shell casings from the scene. There were no security cameras in the area, and no one witnessed the shooting. Knight died from multiple gunshot wounds.

Knight's phone contacts contained appellants' phone numbers listed under their gang monikers: Solorio ("Black"), Lopez ("T Bro") and McMorries ("Disney"). McMorries had called Knight three times on July 5, at 9:58 p.m., 10:11 p.m., and 10:13 p.m. The last phone call from Knight's phone was to McMorries.

Shortly after the shooting, McMorries called Solorio several times, but Solorio did not answer. Finally, at 10:33 p.m., Solorio answered and McMorries told him "hey, it's done, dog." Solorio responded, "you're done," to which McMorries replied, "done." A few minutes later, Solorio sent McMorries a text asking, "did everything go smooth?" and McMorries responded, "yes." At 10:56 p.m., Solorio sent a text to Lopez telling him to "get rid of the phone."

Neslen, who was monitoring these calls and texts in real time, believed Knight had been murdered. Neslen contacted law enforcement in the area. Neslen later heard from Detective David Cortez that Knight was the victim. Neslen and Cortez met and

Neslen informed Cortez about the wiretapping. McMorries was named as a suspect.

### E. Investigation into Knight's Shooting.

Phone records and cell tower triangulation established that between 9:44 p.m. and 10:13 p.m. on July 5, 2010, McMorries' phone was near a cell tower close to the scene of Knight's death. About ten minutes later, his cell phone connected with towers closer to McMorries' home.

On July 6, 2010, McMorries was arrested. During a search of his home, police found .45 caliber ammunition, methamphetamine, and a narcotics scale. Salazar called Solorio for information, saying he had heard gossip. Solorio told Salazar that McMorries was in the Central Jail in the same module.[3] While in jail, Salazar met McMorries in the laundry room. McMorries confessed to Salazar that he had shot Knight because Knight was collecting taxes but not turning them over.[4] McMorries had killed Knight because Lopez and Solorio had come to a mutual agreement that Knight had to be killed. Further, Knight's girlfriend was a snitch and they had told Knight to kill her, but he had not done so.

McMorries explained that, on the night of the shooting, he had set up a meeting with Knight in Knight's neighborhood. When he arrived, Knight was leaning against his car texting. Knight looked up, and McMorries shot him. McMorries took Knight's gun and left.

---

[3]    Before this time, Salazar had not met McMorries.

[4]    This conversation was not taped.

On August 23, 2010, McMorries and Salazar were placed in a cell together and their conversation was taped. McMorries and Salazar discussed Knight's shooting and the presence of an unknown "snitch." McMorries said he was upset because he had not told anyone about the shooting. McMorries believed someone was going to "flip" and go into protective custody. McMorries and Salazar believed Knight's girlfriend was the snitch. Salazar was released from jail on October 18, 2010. As part of his plea agreement, he agreed to wear a wire while continuing to work as a tax collector for Tonito. Neslen conducted surveillance of Salazar. After collecting money, Salazar would turn it over to Lopez or Solorio.

During the time McMorries was in jail, Salazar met with Lopez and Solorio. They discussed Mexican Mafia business, including territories and crimes being committed by other gang members. They also met with other Mexican Mafia members and discussed business.

Solorio told Salazar that local gangs were complaining about Knight because he was collecting too often and asking for too much money. Solorio believed Knight was a drug addict. Salazar believed Solorio and McMorries had formulated a plan to kill Knight's girlfriend but had not decided who would do it.

In late January 2011, Salazar met with Lopez and discussed Mexican Mafia business. Salazar told Lopez that during a meeting he had with Robles and Solorio, Robles asked about Knight and Salazar mentioned he was not with them anymore. Lopez responded that Robles did not need to know about Knight and should not be asking about it.

In mid-March 2011, Salazar met with Solorio and Solorio told him he had been visited by the police who were investigating

Knight's murder. Police told Solorio they believed he had information about Knight's killing. Officer Cortez interviewed Solorio in mid-March 2011 and showed him a pyramid diagram labelled "Organizational Chart" with lines connecting McMorries and Knight to Solorio.

Salazar met with Lopez on March 22, 2011 and they spoke about Solorio's visit from the police. Salazar said he was going to tell Solorio to "step back" and Lopez agreed.

At that time, McMorries had been jailed on a parole violation. McMorries was released in May 2011. On May 20, 2011, Salazar met with Lopez and asked whether he had met with McMorries. Lopez confirmed he had. Lopez complained McMorries was "running his mouth" and talking to many people.

On June 28, 2011, Salazar, Solorio, McMorries and other members of the crew met. McMorries had multiple guns and had a grenade for sale. He revealed he had a van for disabled people with multiple compartments where he kept the guns. McMorries told them he still had Knight's Glock and that he took the gun when Knight was killed.

On July 11, 2011, Salazar met with McMorries under the pretext of buying a gun, but he in fact was attempting to find out about Knight's gun. McMorries told him about the police visit to Solorio's house and the pyramid. Salazar believed McMorries told him he had destroyed three .45s, and Salazar interpreted this to mean that McMorries had gotten rid of Knight's gun. McMorries was no longer collecting taxes because he did not want "his name out there."

McMorries was arrested again on July 13, 2011, for a parole violation. On July 20, 2011, Solorio and Lopez discussed

15

McMorries' arrest. Solorio and Lopez were arrested April 12, 2012.

On September 14, 2014, appellants were being transported to the Long Beach courthouse together. They encountered a Mexican Mafia member who was a witness in an arson case and in protective custody. The witness was acquainted with McMorries. Appellants asked the witness if he could stab Salazar. Salazar later learned appellants told the witness they would take the "green light" off him if he killed Salazar.[5]

## F.   Defense Evidence.[6]

Sandra Gonzalez, the mother of McMorries' son, testified that McMorries and Knight were friends and Knight came to their house often.

On the day of Knight's shooting, between 6:00 to 7:00 p.m., Knight came by Gonzalez's house looking for McMorries. McMorries was out at the time, having left at about 1:00 p.m. that day, but he was there later that evening. They went to Carson Street between 7:00 and 9:00 p.m. to pick up drugs. McMorries was home with her at 10:19 p.m.

With respect to the charges that Lopez and Solario conspired to have two county jail inmates, James Arellano and Daniel Bugarin, killed, two officers on the jail bus testified they would have reported any conversation to solicit harm. Santiago Sencion, one of those who attacked Arellano, denied any involvement with the Mexican Mafia and testified he slapped Arellano because Arellano called him a "bitch."

---

[5]   We discuss the attempted murder counts and the extortion counts in detail later in this opinion.

[6]   Each defendant put on his own defense.

16

Martin Flores, a gang expert, testified the Mexican Mafia was originally formed to protect Hispanic prisoners. The Mexican Mafia is not a "unitary" organization. Thus, not every member treats their "business" or crew in the same way. "Taxes" are paid for many reasons. The Mexican Mafia controls every prison in the state, and taxes ensure that if local gang members go to prison, they are protected from other prison gangs. In that sense, "taxes" are not extortion.

## G.    Verdict and Sentencing.

### 1. McMorries.

The jury found McMorries guilty of first-degree murder (Count 1) and guilty of conspiracy to commit murder, conspiracy to commit extortion, and being a felon in possession of a handgun (Counts 2, 3 and 13). The jury found true the personal discharge of a firearm causing death allegations on Counts 1 and 2 and the allegation that offenses committed in Counts 1, 2 and 3 were committed for the benefit of a criminal street gang. McMorries admitted to five prior prison terms (§ 667.5, subd. (b).).

The trial court sentenced McMorries to an aggregate term of 57 years to life plus 18 years, as follows: (a) on Count 1, 25 years to life, plus 25 years to life for the personal use allegation, plus five years consecutive for the five prior prison terms; (b) on Count 3, seven years to life plus five years consecutive for the five prior prison terms; and (c) on Count 13, the upper term of three years plus five years consecutive for the five prior prison terms. The court stayed sentence on Count 2 pursuant to section 654.

17

### 2. <u>Solorio.</u>

The jury found Solorio guilty of first-degree murder (Count 1) and nine other charges. The jury found true the firearm use enhancements (§§ 12022.53, subds. (b), (c) and (d)) on Counts 1 and 2, and the gang enhancements (§ 186.22, subd. (b)(1)) on Counts 1, 2, 3, 5, 12, 16, 17, 18 and 19.

The trial court sentenced Solorio to an aggregate term of 114 years to life, as follows: (a) on Count 1 (murder), 25 years to life as a major participant with a consecutive term of 25 years to life for the gun use enhancement; (b) on Count 2 (conspiracy to commit murder), the court imposed and stayed, pursuant to section 654, consecutive terms of 25 years to life; (c) on Count 3 (conspiracy to commit extortion), the court stayed imposition of a term pursuant to section 654; (d) on Counts 5 and 12 (extortion), the court imposed a term of seven years to life to be served consecutively with the term in Count 1, and found Count 12 involved a different victim and Solorio was a major participant in a serious crime over an extended period; (e) on Count 15 (possession of a controlled substance), the midterm of three years to be served concurrently with the term in Count 1; (f) on Counts 16 and 18 (attempted murder), the court imposed and stayed pursuant to section 654 the upper term of nine years and found the offense in Count 16 involved a separate victim; (g) on Counts 17 and 19 (conspiracy to commit murder), the court imposed a term of 25 years to life to be served consecutively to Count 1.

### 3. **Lopez.**

The jury found Lopez guilty of first-degree murder and 16 other counts and found true the special allegations concerning firearm use and gang participation.

The trial court sentenced Lopez to an aggregate term of 535 years to life, as follows: (a) on Count 1 (murder), a total of 105 years to life, consisting of 25 years to life, tripled under the Three Strikes Law, plus 25 years for the firearm enhancement, plus five years for the two prior serious felonies; (b) on Counts 2 and 3, the court stayed imposition of sentence pursuant to section 654; (c) on Counts 4 through 12 (extortion), 25 years to life on each count, to run consecutively, plus a five-year gang enhancement; (d) on Count 14 (felon in possession), four years to run concurrently; and (e) Counts 16 and 18 (attempted murder) 25 years to life tripled, plus a five year gang enhancement.

## DISCUSSION[7]

### I.  SEVERANCE OF TRIAL

McMorries argues the trial court abused its discretion in declining to sever his trial from that of his co-defendants Solorio and Lopez. McMorries asserts his connection to the otherdefendants and the Mexican Mafia was minimal; he was not a "member" of the Mexican Mafia, was not charged in or implicated in any of the other crimes committed by Lopez and Solorio, was not a target of the four-year investigation into Tonito's operation, had nothing to do with the general operations of the crew under Tonito, had no history of committing crimes for the benefit of the Mexican Mafia, was only heard on wiretaps seven times and only between June 30 and July 5, 2010, and spent most of the two years after Knight's murder in jail or

---

7      To the extent applicable, the appellants join in each other's arguments.

prison. As a result, he contends the trial resulted in a denial of due process of law that requires reversal. We disagree.

### A.    Factual Background.

McMorries was charged in four of the 19 counts. He was charged jointly with Solorio and Lopez in Count 1 (murder), Count 2 (conspiracy to murder) and Count 3 (conspiracy to extort), and was charged separately in Count 13 with unlawfully possessing a firearm.  Codefendants Solorio and Lopez, either jointly or independently with each other, were charged with extortion (Counts 4-12), felon in possession of a firearm (Count 14), transportation of a controlled substance (Count 15), attempted murder (Counts 16 and 18), and conspiracy to murder (Counts 17, 19).

On August 1, 2016, McMorries filed a motion to sever his case from Solorio and Lopez. He argued that because he was only charged in four counts of the 19-count amended information, the evidence to be admitted against Solorio and Lopez related to the other counts and would be voluminous and prejudicial.

In its opposition filed November 2, 2016, the prosecution argued the evidence "against the three defendants is inextricably intertwined," and the pattern of extortion established in the counts against codefendants Solorio and Lopez is directly relevant to all defendants' liability for conspiracy and murder. Furthermore, evidence applicable to the counts unrelated to McMorries would be cross-admissible because it was relevant and material to the murder and conspiracy charges against him. The prosecutor argued that statements by Lopez and Solorio to Salazar "sometimes reference McMorries" and show that they "were all working in concert," and the extortion plot explains the motive for Knight's murder.

20

At the hearing on the motion, McMorries argued that only 10 to 20 percent of the preliminary hearing evidence related to him or the charges against him and evidence against the other defendants, including recorded wiretaps, phone calls and meetings during which other assassinations and extortion plots are discussed, would be highly prejudicial.

The trial court noted that its tentative ruling was to deny severance because the charges dealt with "interrelated events" and "cross-admissible evidence in the sense that they're all connected." Observing that the charges related to "different parts of the same criminal enterprise," the trial court denied the motion. "Like a sophisticated drug ring or something, there is going to be different parts and pieces of that criminal enterprise that don't always involve all the parties, but they're part of the enterprise and you kind of have to take the ride with everybody else because you're a part of it. In one piece or another, you're part of it. Certainly the allegation with . . . McMorries's piece or part are very significant, and it would not make sense to separate it out. We would be hearing the same witnesses over and over again. It would be unnecessarily redundant and an unnecessary use of our time and the jury's time to separate out these cases." Ultimately, the trial court denied the severance motion.

### B.    Discussion.

Section 1098 provides in relevant part: "When two or more defendants are jointly charged with any public offense, whether felony or misdemeanor, they must be tried jointly, unless the court orders separate trials." Section 1098 illustrates the Legislature's "strong preference for joint trials," including joint penalty phase trials. (*People v. Winbush* (2017) 2 Cal.5th 402, 455; *People v. Sanchez* (2016) 63 Cal.4th 411, 463–464 (*Sanchez*).)

21

"Joint trials promote efficiency and help avoid inconsistent verdicts." (*Ibid*.)

"Joint proceedings are not only permissible but are often preferable" when, as here, the "defendants' criminal conduct arises out of a single chain of events. Joint trial may enable a jury 'to arrive more reliably at its conclusions regarding the guilt or innocence of a particular defendant'" and the trial judge "to assign fairly the respective responsibilities of each defendant in the sentencing;" plus it conserves judicial resources. (*Kansas v. Carr* (2016) 577 U.S. 108, 125; *People v. Silveria and Travis* (2020) 10 Cal.5th 195, 242.)

The legislative preference for joint trials is, however, "subject to a trial court's broad discretion to order severance." (*People v. Thompson* (2016) 1 Cal.5th 1043, 1079 (*Thompson*).) "Factors that may bear on a trial court's decision to order separate trials include "'an incriminating confession, prejudicial association with codefendants, likely confusion resulting from evidence on multiple counts, conflicting defenses, or the possibility that at a separate trial a codefendant would give exonerating testimony.'" [Citations.] Severance may also be appropriate where "'there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants or prevent the jury from making a reliable judgment about guilt or innocence.'" [Citations.]" (*People v. Gomez* (2018) 6 Cal.5th 243, 274.)

In considering a motion to sever, the factors to be evaluated are: (1) the cross-admissibility of the evidence in separate trials; (2) whether some of the charges are likely to unusually inflame the jury against the defendant; (3) whether a weak case has been joined with a strong case or another weak case so that the total

evidence may alter the outcome of some or all of the charges; and (4) whether one of the charges is a capital offense, or the joinder of the charges converts the matter into a capital case. (*Alcala v. Superior Court* (2008) 43 Cal.4th 1205, 1220–1221.)

Prejudicial association justifying severance involves circumstances where evidence regarding a codefendant might make it likely the jury would: (1) convict the codefendant; and (2) convict the defendant based on his relationship with the codefendant rather than on the separate evidence against the defendant. (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 152.) Merely trying "crime partners" together is not prejudicial association. (*People v. Cummings* (1993) 4 Cal.4th 1233, 1286 [where defendants were "crime partners in several of the robberies and in the murder, prejudicial association with a codefendant is not a factor"].)

Whenever defendants are jointly tried, "part of the prosecution's case will naturally attempt to establish that the defendants associated with each other, at least to the extent that they all participated in the crimes at issue." (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 383.) "That defendants associated more broadly than their specific involvement in the alleged crimes may also be directly relevant to establishing their guilt." (*Ibid*.) It is also likely that different defendants participating together in a crime "will have different levels of involvement and different personal backgrounds. These circumstances alone do not compel severance or render a joint trial grossly unfair. Individuals who choose to commit crimes together are not generally entitled to shield the true extent of their association by the expedient of demanding separate trials." (*Ibid*.)

"We review a trial court's denial of a severance motion for abuse of discretion, based on the facts at the time of the trial court's ruling." (*People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 819.) "To establish an abuse of discretion, defendant[ ] must demonstrate that the trial court's decision was so erroneous that it 'falls outside the bounds of reason.' [Citation.] A merely debatable ruling cannot be deemed an abuse of discretion." (*People v. Bryant, Smith and Wheeler, supra,* 60 Cal.4th at p. 390.) "[E]ven if a trial court acted within its discretion in denying severance, "'the reviewing court may nevertheless reverse a conviction where, because of the consolidation, a gross unfairness has occurred such as to deprive the defendant of a fair trial or due process of law.""'" (*Thompson, supra,* 1 Cal.5th at p. 1079.)

## C.    Appellants Were Properly Tried Together

"A 'classic' case for joint trial is presented when defendants are charged with common crimes involving common events and victims." (*People v. Keenan* (1988) 46 Cal.3d 478, 499–500.)

Here, all the offenses arose out of the operations of a gang that all appellants were involved with. McMorries volunteered to kill Knight, and his role in the killing of Knight was the most dramatic evidence presented to the jury. McMorries trapped Knight and shot him repeatedly when Knight looked up from his phone. Knight "didn't have a chance." Accordingly, there was no danger that McMorries would have been convicted in counts 1, 2, 3, or 13, based on evidence pertinent to Lopez and Solorio admitted on the other counts or as a result of "guilt by association." Thus, there was no reasonable possibility that the jury would be confused by the presence of additional counts against appellants Lopez and Solorio only.

Indeed, the evidence of McMorries' involvement in the murder of Knight was overwhelming. McMorries was recorded plotting to kill Knight, affirming that he had done so, and admitting that he had destroyed the weapon he used in Knight's murder. McMorries admitted to Salazar that he had personally killed Knight as part of a plan agreed upon by all three appellants.

Further, the evidence on all counts was cross-admissible. The conduct of the Mexican Mafia as an organization, including the conduct of Lopez and Solorio, was admissible against McMorries to establish his motive in the murder of Knight, his motive in the conspiracy to murder Knight, his motive and role in the conspiracy to commit extortion, and to prove the truth of the gang enhancement allegations. (*People v. Hardy* (1992) 2 Cal.4th 86, 170 [conspiracy charges involving codefendants a basis for cross-admissibility of evidence]; *People v. Vega-Robles* (2017) 9 Cal.App.5th 382, 432 [same].)

McMorries' reliance on *People v. Chambers* (1964) 231 Cal.App.2d 23 is misplaced. In *Chambers*, two defendants were tried together for offenses involving incidents committed separately against patients in a nursing home. One defendant owned the nursing home, and the other worked there as a nurse. *Chambers* observed that the case involved no "joint or conspiratorial action" on the part of the defendants. (*Id.* at p. 26.) Further, "in the absence of any charge of concerted or conspiratorial action," the defendants should not have been tried together because of overwhelming evidence that the nurse defendant had engaged in a pattern of long-standing brutality against patients that did not involve the owner of the facility. (*Id.* at p. 29.) Here, in contrast to *Chambers*, appellants were jointly

charged with conspiracy to commit murder and conspiracy to commit extortion. The evidence showed they worked in concert to extort and kill.

Finally, the trial court also instructed the jury that it had to separately determine whether appellants were members of the charged conspiracies, and that appellants were not liable as co-conspirators for the acts of their co-defendants that were committed prior to the time that they joined their conspiracy to commit extortion. McMorries has failed to establish that the trial court abused its discretion when it denied his severance motion, that he would have obtained a more favorable result if he had been tried by himself on counts 1, 2, 3, or 13, or that joinder resulted in gross unfairness amounting to a denial of due process.

## II.     EXPERT TESTIMONY RE GANG CODE

McMorries and Lopez, joined by Solorio, argue that admission of expert testimony interpreting their slang or "gang code" improperly invaded the province of the jury, thereby violating their due process right. The contend a gang expert has no expertise regarding what a speaker meant by a particular statement and can only testify how a word or phrase is commonly used in a gang subculture.

### A.     Relevant Factual Background.

Over multiple and continuous objections, the prosecution's experts, including Neslen, testified to the meaning of defendants' slang statements in conversations testified to at trial or as captured by wiretaps, body wires, and texts. In these statements, the defendants used slang, initials, nicknames, abstruse language and code words. Neslen testified, "[T]hey have idioms, which are words or phrases that are very commonly used within

the organization that mean something to them." The gang members also use initials. The purpose of using this slang or code is to hide the meaning of the speaker's words.

*(a)    Specific Terminology.*

At trial, witnesses testified to the meanings of specific phrases, sometimes revealing a disagreement about what the phrases mean.

For example, the phrase "hard candy" as used within the Mexican Mafia, may mean an order to kill. Detective Neslen testified "my understanding of the term "hard candy," based on my training and experience, is that it's an authorization to kill," and "'hard candy' is a code word for murder."

On the other hand, Martin Flores, also a gang expert, testified that in some instances the phrase could mean to assault someone. "An individual may be told to give a hard candy, and somebody may . . . actually [be] killed or maybe a result of [sic] somebody just getting assaulted. Through my experience in cases, I have seen where hard candy basically means to make sure they get stuck, to get hit, to get stabbed."  "I want people to understand I worked on cases where this term 'hard candy' is being used. . . . [O]n a case in L.A. County, the county jail where somebody was stabbed. . . . . [A] phone call was made by the individual to another person, and that person was told to make sure he gets hard candy." Although there was a "hard candy" order out on him, the victim  testified the phrase did not necessarily mean that someone would be killed.

As noted above, "Green light" means that permission had been given by Mexican Mafia leaders to assault or kill someone. Both Salazar and Neslen testified to the meaning of this phrase.

Detective Neslen testified the phrase "it's a wrap" was commonly used by Mexican Mafia to signify that someone needed to be killed. "There is finality to it, like, 'hey, it's over.'" This might mean that someone violated a rule, "[s]ome rule that he can't get out of. He can't come back into [the] fold." Neslen had heard the phrase in the context of murder, like, "hey, we need to kill that guy."

In addition, Neslen testified to his opinion regarding what the defendants meant when they used certain phrases. For example, Neslen testified that when Flaco said, "I thought that fool was all good when we had met up with D," and Solorio responded "Since that day nothing came through, dog," they were referring to money.

### (b) Specific Conversations Interpreted.

At trial, Neslen testified to the meaning of language used in some of the intercepted phone calls.

Neslen testified that when Knight stated "I'ma [sic] pick up, like three new neighborhoods for next month, homie," in the context of tax collection, Knight meant he was going to have three new street gangs start paying taxes monthly. Knight's statement that "I'm going to make every neighborhood kick in an extra hundred," according to Neslen meant he was going to collect $100 more.

Although in other contexts the initial "T" could refer to Tonito, when Solorio told Lopez that "homeboy called you T", "he's not answering our calls" and "I sent a little squad out there to try to look for him," Solorio was referring to "Tiny" Knight when he used the initial "T."

On June 29, 2010, in a conversation between Solorio and Knight, Solorio told Knight "I'm going to need to get that from

you, dog, because they're over here asking for it" and "So you got that or what?" they were referring to monthly tax money. In particular, Neslen stated ""Based on my knowledge and experience of this case, in this call, the word 'that' is referring to the monthly tax money." Neslen based his conclusion on the crew's custom of collecting taxes at the beginning of the month, and because it was late June at the time of the call, Solorio was referring to the June collection. Knight told Solorio that "I got it still" and "the next one is already coming up," which Neslen believed referred to June and July taxes. Solorio told Knight that they were "over here asking for it" and "we're both asking for it, homie." Neslen thought this referred to the late June taxes, and that both Solorio and Lopez were looking for Knight's tax collection.

### (c) Defendants' Objections

During trial, Lopez and the other defendants objected to the prosecution witness's interpretation of slang, arguing there was a significant distinction between expert testimony to the meaning of slang terms and expert testimony interpreting what a particular defendant meant when he used such a slang term. Initially, the trial court disagreed. However, after much of the testimony had come in, the trial court agreed, concluding the expert could not testify "this is what the speaker meant" when such a term was used.

Following the verdict, Lopez filed a new trial motion arguing the trial court improperly permitted expert testimony to encompass the defendants' guilt in the guise of interpreting their code. The trial court denied the motion.

## B.    Discussion.

Defendants contend the experts' opinions concerning what the speakers meant by coded language, as opposed to how such terms are commonly used in gang subculture, was inadmissible. They contend the witnesses improperly testified to the defendants' intent, and their objections to the testimony should have been sustained. We review the trial court's decision to admit expert testimony for abuse of discretion (*People v. Prince* (2007) 40 Cal.4th 1179, 1223), and find none here.

While lay witnesses are allowed to testify only about matters within their personal knowledge (Evid. Code, § 702, subd. (a)), expert witnesses are given greater latitude. "A person is qualified to testify as an expert if he has special knowledge, skill, experience, training, or education sufficient to qualify him as an expert on the subject to which his testimony relates." (Evid. Code, § 720, subd. (a).) An expert may express an opinion on "a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." (Evid. Code, § 801, subd. (a).)

However, "an expert has traditionally been precluded from relating case-specific facts about which the expert has no independent knowledge. Case-specific facts are those relating to the particular events and participants alleged to have been involved in the case being tried. . . . An expert is also allowed to give an opinion about what those facts may mean. The expert is generally not permitted, however, to supply case-specific facts about which he has no personal knowledge." (*People v. Sanchez* (2016) 63 Cal.4th 665, 675–676.)

Although an expert witness may express an opinion that embraces an ultimate issue to be determined by the trier of fact,

30

provided the expert's opinion is otherwise admissible (Evid. Code, § 805), the expert may not offer an opinion on how the case should be decided. (*People v. Killebrew* (2002) 103 Cal.App.4th 644, 651 (*Killebrew*), disapproved on other grounds in *People v. Vang* (2011) 52 Cal.4th 1038, 1047, fn. 3 (*Vang*).) An expert may not opine on the defendant's guilt. (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 77.) "The reason for this rule is not because guilt is the ultimate issue of fact for the jury, as opinion testimony often goes to the ultimate issue. [Citations.] Rather, opinions on guilt or innocence are inadmissible because they are of no assistance to the trier of fact. To put it another way, the trier of fact is as competent as the witness to weigh the evidence and draw a conclusion on the issue of guilt." (*Vang, supra,* 52 Cal.4th at p. 1048.)

In *People v. Champion* (1995) 9 Cal.4th 879, the court sanctioned the use of expert testimony to explain gang terminology. The defendants asserted the trial court erred in permitting a deputy sheriff to explain the meaning of several words used by defendants during a conversation in a van transporting them to jail. The defendants reasoned this testimony was beyond the scope of the deputy's gang expertise. *Champion* disagreed, concluding the deputy had spent years investigating and associating with juvenile gangs and therefore the trial court could reasonably determine he was sufficiently familiar with gang terminology to accurately interpret the words used by defendants. *Champion* observed, "[t]he use of an expert for this purpose is not uncommon" and further that "the meaning of some of the words used by defendants were 'sufficiently beyond common experience that the opinion of an expert would assist the trier of fact . . . .' (Evid. Code, § 801, subd. (a).)" (*Id.* at p. 924.)

31

Nonetheless, appellants rely on *Killebrew*, where the court determined certain gang expert opinion testimony was improperly admitted because the expert "testified to the subjective knowledge and intent" of certain alleged gang members by testifying that each of the alleged gang members knew there was a gun in one of the cars and jointly possessed the gun with every person in each of the three cars for their mutual protection. (*Killebrew*, at p. 658.) However, "*Killebrew* does not generally prohibit such testimony; rather, the reviewing court concluded that in view of the facts and circumstances of that case, the expert's opinion about the defendant's subjective knowledge and intent was inadmissible." (*People v. Roberts* (2010) 184 Cal.App.4th 1149, 1194.) *Roberts* observed that in *Killebrew*, the expert's opinion was the only evidence offered to establish the elements of the crime. "As such, it was 'the type of opinion that did nothing more than inform the jury how [the expert] believed the case should be decided.'" (*Roberts, supra,* at p. 1194.) Without other evidence, the expert opinion may impermissibly invade the province of the trier of fact. (*Ibid.*)

Here, the expert testimony assisted the jury and was not unduly prejudicial. In addition to defining what appeared to be ordinary phrases ("it's a wrap," "green light," and "hard candy") in terms of their gang culture definitions, the experts provided necessary context for the use of other common words, such as "that" or "it" which could not be properly understood without Neslen's expertise. Such testimony did not cross the line into being prohibited testimony concerning the defendants' intent to commit a crime: Neslen did not testify, for example, that when Solorio said "it's a wrap," Solorio intended to kill Knight. Further, the witnesses did not testify to the elements of the crime, as

prohibited by *Killebrew,* but interpreted phrases commonly used by the defendants in connection with the tax collection enterprise and put the statements in context.

Finally, admission of this evidence did not violate defendants' due process rights. Due process is not offended by the admission of relevant evidence unless it is so prejudicial as to render the criminal trial fundamentally unfair. (*People v. Jablonski* (2006) 37 Cal.4th 774, 805.) In the absence of fundamental unfairness, the harmless error test of *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*), is used to analyze an evidentiary error that involves state law. (*People v. Partida* (2005) 37 Cal.4th 428, 439.) The question is "whether it is reasonably probable the verdict would have been more favorable to the defendant absent the error." (*Ibid*.) Here, given the sheer number of telephone calls the experts testified to and the structure and operations of the crew, the evidence of defendants' guilt was considerable apart from the slang interpretations. For example, McMorries confessed to killing Knight in a taped conversation, and told Salazar that he had done so after conferring with Lopez and Solorio and receiving the authorization from Tonito.

## III. HEARSAY STATEMENTS PROVIDE SUBSTANTIAL EVIDENCE TO SUPPORT LOPEZ'S CONVICTION.

Lopez argues insufficient evidence supports his conviction for the murder of Knight (Count 1) because the only evidence of his participation in the killing consists of the uncorroborated multi-level hearsay statements of accomplices Solorio and McMorries. As a result, he argues, admission of what he contends are unreliable statements violated his due process and

33

confrontation rights and section 1111's requirement of independent corroboration.

## A. Relevant Factual Background.

Salazar learned of the agreement to kill Knight from McMorries, who heard of it from Solorio.

As noted above, Tonito was at the top of the local Mexican Mafia hierarchy, while Lopez acted as a camarada or chief of the crew. Those who violated the Mexican Mafia's rules could be killed or otherwise harmed, as Lopez stated, "I'll [f] you up just to [f] you up . . . . Because I can do that." According to Lopez, Tonito wanted to minimize Lopez's role within his crew.

Lopez was aware that Knight was not turning over taxes he had collected. McMorries told Solorio he had discussed Knight with Lopez. Lopez knew McMorries had volunteered to kill Knight. After Knight's killing, McMorries told Salazar in the jail's laundry room (in an untaped conversation) that he had done it pursuant to approval obtained from Lopez and Solorio. Solorio also stated that Lopez had authorized the killing.

Lopez met with Salazar, who told him McMorries had stated he killed Knight. Lopez told Salazar he instructed Solorio to "deal with" Knight's skimming; "deal with it" meant to kill Knight. Lopez told Salazar that Robles did not need to know about the killing.

At trial, Lopez objected to the hearsay statements. The trial court ruled they were admissible under several hearsay exceptions, including declaration against penal interest (Evid. Code, § 1230), statement of co-conspirator (Evid. Code, § 1223), and party admissions (Evid. Code, § 1220).

## B.    Discussion

### 1.    *Lopez's Conviction Based on the Hearsay Statements of Nontestifying Accomplices Did Not Violate Due Process.*

Lopez argues that aside from accomplice testimony, nothing independently connects him to Knight's murder.

An accomplice is "one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given." (§ 1111.) The testimony of accomplices must be corroborated by "such other evidence as shall tend to connect the defendant with the commission of the offense." (*Ibid.*) This evidence may not come from or require "'aid or assistance'" from, the testimony of other accomplices or the accomplice himself. (*People v. Davis* (2005) 36 Cal.4th 510, 543.) Section 1111 reflects the Legislature's determination that because accomplice testimony poses reliability questions, it is, without additional evidence, insufficient as a matter of law to support a conviction. (*People v. Rodriguez* (2018) 4 Cal.5th 1123, 1128; *People v. Romero and Self* (2015) 62 Cal.4th 1, 32.)

The corroborating evidence, however, need not substantiate every fact to which the accomplice testifies. (*People v. Davis, supra*, 36 Cal.4th at p. 543; *People v. Perez* (2018) 4 Cal.5th 421, 452.) The entire conduct of the parties, their relationship, acts, and behavior may be taken into consideration by the trier of fact in determining the sufficiency of the corroboration. The evidence need not independently corroborate every fact to which the accomplice testifies, and "'"may be circumstantial or slight and entitled to little consideration when standing alone."'" (*People v. Dalton* (2019) 7 Cal.5th 166, 246–247.) "'Corroborating

evidence . . . 'is sufficient if it tends to connect the defendant with the crime in such a way as to satisfy the jury that the accomplice is telling the truth.' [Citation.]'" (*People v. Lewis* (2001) 26 Cal.4th 334, 370.) '

The jury's determination on the issue of corroboration is binding on the reviewing court unless the corroborating evidence should not have been admitted or does not reasonably tend to connect the defendant with the commission of the crime. (*Romero and Self, supra*, 62 Cal.4th at pp. 32–33.)

Here, substantial evidence independently corroborates the accomplice testimony. Aiders and abettors are liable for first-degree premeditated murder if the evidence establishes the defendant aided or encouraged the commission of the murder with knowledge of the unlawful purpose of the perpetrator and with the intent or purpose of committing, encouraging, or facilitating its commission. (*People v. McCoy* (2001) 25 Cal.4th 1111, 1117–1118.)

Lopez, in his role as camaradas, had the power to have people killed for violating the Mexican Mafia rules. As noted previously, Lopez stated he would "[f] people up" because he "could do that." Moreover, he said, even "though I'm a thousand miles away . . . I [can] reach out and touch you." Further, there was evidence that, in the context of Knight's killing, Lopez knew Knight was skimming taxes. McMorries told Solorio he had spoken to Lopez and received approval from Lopez to proceed with Knight's killing. McMorries admitted to shooting Knight. Later, evidencing knowledge of the shooting, Lopez said McMorries should "shut up" about the killing.

When this accomplice testimony evidence is paired with non-accomplice testimony, sufficient corroboration exists. For

36

example, non-accomplices Robles and Salazar testified to Knight's troubles. Knight called Robles and asked for help because he was in trouble with Solorio and Lopez. Robles told Knight she would talk to them and try to work out a payment plan. Robles spoke to Solorio and asked what Knight could do to rectify the situation. Solorio said Knight was "through" and she should not talk to him anymore. In late January 2011, Salazar met with Lopez and discussed Mexican Mafia business. Salazar told Lopez that during a meeting he had with Robles and Solorio, Robles asked about Knight and mentioned he was not with them anymore.

These facts, when coupled with the accomplice testimony establish there is substantial evidence Lopez acted to aid and abet McMorries in the shooting. Independent evidence "''need not corroborate the accomplice as to every fact to which he testifies but is sufficient if it does not require interpretation and direction from the testimony of the accomplice yet tends to connect the defendant with the commission of the offense in such a way as reasonably may satisfy a jury that the accomplice is telling the truth. . . .' [Citations.]''" (*People v. Davis* (2005) 36 Cal.4th 510, 543.)

### 2. *Multiple Levels of Hearsay.*

Lopez argues the trial court erred in concluding statements at all levels of hearsay qualified for an exception. Rather, he asserts, Solorio's statement, when passed from McMorries to Salazar, constituted multiple levels of hearsay that did not qualify for the co-conspirator exception and, in any event, those statements were made after the conspiracy concluded. We disagree.

Hearsay is an out-of-court statement offered for the truth of its content. (Evid. Code, § 1200, subd. (a).) Hearsay is generally inadmissible unless it falls under an exception. (Evid. Code, § 1200, subd. (b).) "Multiple hearsay, or hearsay-within hearsay, is admissible only when each level of hearsay 'meets the requirements of an exception to the hearsay rule.'" (*People v. Superior Court (Couthren)* (2019) 41 Cal.App.5th 1001, 1010; *People v. Anderson* (2018) 5 Cal.5th 372, 403; Evid. Code, § 1201 ["statement within the scope of an exception to the hearsay rule is not inadmissible on the ground that the evidence of such statement is hearsay evidence if such hearsay evidence consists of one or more statements each of which meets the requirements of an exception to the hearsay rule"].)

Here, the statements of Lopez, McMorries and Solorio constitute party admissions and are admissible against them as exceptions to the hearsay rule (Evid. Code, § 1220 ["[e]vidence of a statement is not made inadmissible by the hearsay rule when offered against the declarant in an action to which he is a party]".) Further, the statements of each appellant are declarations against interest because they exposed each of the declarants to penal sanctions. (Evid. Code § 1230.) Each appellant's admission would establish his participation in the conspiracy, and would establish his aiding and abetting of Knight's murder.

Lastly, any statements by Lopez that furthered the conspiracy to murder Knight were admissible. (Evid. Code, § 1223.)[8] Under the co-conspirator exception to hearsay rule,

---

[8]     Evidence Code section 1223 provides, "Evidence of a statement offered against a party is not made inadmissible by the

three preliminary facts must be established for evidence of co-conspirator's declaration to be admissible: (1) that declarant was participating in the conspiracy in question at the time of the declaration; (2) that the declaration furthered or was meant to further the conspiracy's objective; and (3) that the party against whom evidence is offered was, at the time of the declaration, participating in the conspiracy, or would later participate in it. (*People v. Clark* (2016) 63 Cal.4th 522, 562.) Here, even those statements made after the Knight killing had happened are admissible because the parties were actively participating in a conspiracy to further the aims of the Mexican Mafia's extortion activities.

### 3. Due Process/Confrontation Clause.

Lopez argues that his Confrontation Clause and due process rights were violated by the admission of the hearsay statements of his co-defendants because the statements were inherently unreliable. Lopez notes that under the *Aranda-Bruton* rule,[9] prior to the decision in *Crawford,* the statements here would have been inadmissible; further, the distinction between

hearsay rule if: [¶] (a) The statement was made by the declarant while participating in a conspiracy to commit a crime or civil wrong and in furtherance of the objective of that conspiracy; [¶] (b) The statement was made prior to or during the time that the party was participating in that conspiracy; and [¶] (c) The evidence is offered either after admission of evidence sufficient to sustain a finding of the facts specified in subdivisions (a) and (b) or, in the court's discretion as to the order of proof, subject to the admission of such evidence."

9    *Bruton v. United States* (1968) 391 U.S. 123; *People v. Aranda* (1965) 63 Cal.2d 518.

39

testimonial and non-testimonial statements drawn by *Crawford* does not transmute these statements into reliable forms of proof. Lopez points out that Salazar was a paid informant who later committed a crime, making his testimony unreliable. He contends admitting Salazar's statements was error. We disagree.

In *Crawford,* the United States Supreme Court held the Sixth Amendment prohibits the admission of a witness's "testimonial" out-of-court statements offered for their truth unless the witness is unavailable and the defendant had a prior opportunity for cross-examination. (*Crawford v. Washington* (2004) 541 U.S. 36, 59–60, fn. 9.) Under previous United States Supreme Court precedent, the admission of hearsay did not violate the right to confrontation if it bore "adequate 'indicia of reliability.'" Reliability was inferred without more in a case where the evidence fell within "a firmly-rooted hearsay exception. In other cases, the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness." (*Ohio v. Roberts* (1980) 448 U.S. 56, 66.)

*Crawford* overturned the *Roberts* rule. *Crawford* clarified that a mere showing of hearsay reliability was insufficient to satisfy the confrontation clause. "To be sure, the Clause's ultimate goal is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee. . . . [¶] The *Roberts* test allows a jury to hear evidence, untested by the adversary process, based on a mere judicial determination of reliability. It thus replaces the constitutionally prescribed method of assessing reliability with a wholly foreign one." (*Crawford, supra*, 541 U.S. at pp. 61–62.) Under *Crawford*, if an exception was not recognized at the time of the Sixth Amendment's adoption, admission of testimonial hearsay against

a criminal defendant violates the confrontation clause unless (1) the declarant is unavailable to testify and (2) the defendant had a previous opportunity to cross-examine the witness or forfeited the right by his own wrongdoing. (*Crawford,* at pp. 62, 68; see *Giles v. California* (2008) 554 U.S. 353, 357–373.)

*Aranda-Bruton* involves the introduction of the confession of a co-defendant. (See generally, *People v. Washington* (2017) 15 Cal.App.5th 19, 26 [explaining reach of *Aranda-Bruton* rule].) In *Bruton*, the United States Supreme Court held that the admission of a non-testifying codefendant's confession implicating the defendant violates the confrontation clause's guarantee of the right to cross-examination even if the jury is instructed to disregard the confession as to the defendant. (*Bruton v. United States, supra,* 391 U.S. at pp. 127–128.) The *Aranda* court reached a similar conclusion on non-constitutional grounds. (*People v. Aranda*, supra, 63 Cal.2d at pp. 528–531; see also *People v. Fletcher* (1996) 13 Cal.4th 451, 455.)

However, nearly 40 years after *Aranda* and *Bruton* were decided, the United States Supreme Court held that the confrontation clause only prohibits the admission of testimonial hearsay statements. (*Crawford, supra*, 541 U.S. at pp. 59, 68–69; see *Whorton v. Bockting* (2007) 549 U.S. 406, 420 [confrontation clause has no application to out-of-court nontestimonial statements]; *People v. Gutierrez* (2009) 45 Cal.4th 789, 812 ["[o]nly the admission of testimonial hearsay statements violates the confrontation clause"].) "Nontestimonial hearsay is subject only to 'traditional limitations upon hearsay evidence' and does not implicate the Sixth Amendment right of confrontation." (*People v. Arauz* (2012) 210 Cal.App.4th 1394, 1401–1402.)

In *Crawford*, the United States Supreme Court did not explicitly define "testimonial statements," however. (*Crawford, supra*, 541 U.S. at p. 51.) But *Crawford* did describe types of statements that constitute a "core class" of testimonial statements. These include functional equivalents of in-court testimony, such as affidavits and similar pretrial statements "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." (*Id*. at pp. 51–52.) In sum, "the confrontation clause is concerned solely with hearsay statements that are testimonial, in that they are out-of-court analogs, in purpose and form, of the testimony given by witnesses at trial." (*People v. Cage* (2007) 40 Cal.4th 965, 984 (*Cage*).) To be "testimonial" under *Crawford*, a statement must have been "given and taken *primarily for the purpose* [of] . . . establish[ing] or prov[ing] some past fact for possible use in a criminal trial." (*People v. Cage* (2007) 40 Cal.4th 965, 984.)

"[S]tatements made unknowingly to an informant or statements between fellow prisoners," however, "are 'clearly nontestimonial.'" (*People v. Fayed* (2020) 9 Cal.5th 147, 169.) *People v. Arauz, supra,* 210 Cal.App.4th 1394, is illustrative. There, the defendants were charged with attempted murder in a gang-related shooting. (*Id*. at p. 1397.) During the investigation, police arrested a suspected accomplice for an unrelated drug offense and placed him in a cell adjoining a paid informant posing as a Mexican Mafia member. (*Id*. at p. 1399.) The accomplice, deceived by this ruse, told the informant he drove the defendants to the scene and defendants shot the victims. (*Ibid*.) Defendants asserted that evidence of the accomplice's incriminating statements violated their confrontation clause rights. (*Id*. at p.

1402.) Rejecting that argument, the Court of Appeal held the statements were nontestimonial because the accomplice "thought he was answering to the Mexican Mafia. He had no belief that his statements were being monitored and would be used in a subsequent trial." (*Ibid.*)

Like the defendant in *Arauz, supra*, 210 Cal.App.4th 1394, McMorries did not realize he was conversing with an informant. Nor were Solorio's conversations with McMorries or Lopez testimonial. (See *People v. Gallardo* (2017) 18 Cal.App.5th 51, 67–68 [statements were nontestimonial because, regardless of informant's intent in asking the question, there was no evidence defendant knew or suspected the informant was a government agent or that his comments might be used at trial].)

Lopez's *Aranda-Bruton* argument fails for the same reason. Post-*Crawford*, the rule of those cases applies only to testimonial statements. (*People v. Cortez* (2016) 63 Cal.4th 101, 129 [rejecting *Bruton* argument because, among other things, "'the confrontation clause applies only to testimonial hearsay statements'"]; see also *People v. Washington, supra,* 15 Cal.App.5th at p. 28.)

> ### 4. Substantial Evidence Supports Lopez's Murder Conviction.

In sum, Lopez argues Solorio's hearsay statement to McMorries that Lopez had agreed to the killing of Knight, which was related by Salazar through an unrecorded conversation, does not constitute substantial evidence. We disagree. Because the statement is admissible, it demonstrates that Lopez was aware of and involved in the agreement to have Knight killed because Knight had failed to turn over his tax collections.

43

# IV. SUBSTANTIAL EVIDENCE ALSO SUPPORTS LOPEZ AND SOLORIO'S CONVICTIONS FOR EXTORTION AND CONSPIRACY TO COMMIT EXTORTION.

Solorio argues insufficient evidence supports his convictions on Counts 5 and 12, which charge him with extortion by threat jointly with Lopez. Lopez concurs and expands the argument to include his convictions for conspiracy to commit extortion and extortion on Counts 3, 4, 6, 7, 8, 9, 10, and 11, which McMorries joins with respect to Count 3. They contend there is no evidence that they or someone acting at their direction threatened to inflict unlawful injury upon the victims with the specific intent to induce the victims to surrender money, or that the threat was the controlling cause of the victims' surrender of money or property. Further, they contend the practices of the Mexican Mafia cannot supply the necessary mental state of an aider and abettor, nor can it be supplied by propensity evidence.

## A. Factual Background.

Salazar told individuals from whom he collected taxes that they had to pay. On occasion, someone who refused to pay taxes would be beaten, or killed. Salazar would give collected tax money to Lopez. Franco testified individuals are told that if they do not pay, they would "have problems."

Serrano, who was a tax collector for Tonito's crew, collected taxes from gangs in Bell Gardens and turned the money ("rent") over to Solorio. Serrano testified that all the crew's tax collectors were armed. Local gang members and drug dealers do not like to pay taxes, and only do so because they know they will face violence or the threat of violence. Later, Lopez started picking up

44

the taxes from Serrano. Lopez told Serrano that if he had any problem collecting taxes, Lopez would take care of it. The Mexican Mafia exerts a lot of influence over local gangs because the local gangs know that if their members do not pay taxes, and later end up in jail or prison, they could be harmed.

With respect to specific counts, the prosecution presented evidence of taped phone calls and surveillance of the victims giving money to Salazar, as well as Salazar's testimony that he collected money from certain individuals. These included Carmelo Pizzaro ("Spooky") (Count 4), Robert Abeyta ("Clumsy") (Count 6), Alex Medrano ("Dreamer") (Count 7), Arnulfo Chavez ("Froggy") (Count 8), Jerome Saucedo ("Lazy") (Count 9), Mario Munoz ("Skinny") (Count 10) and Manuel Gomez (Count 11).

More individualized evidence was presented for Counts 5 and 12.

Count 5 concerned extortion of Vincent Lugo ("Crook"). Neslen heard Lugo make telephone calls in September 2010 to Salazar's wife and arrange to deliver money to her. Several days later, Salazar's wife turned over the money to Solorio, which she described as "$400 from WES (Lugo)." In early November 2010, surveillance observed Lugo give $400 to Salazar at a restaurant in South Gate. This money was subsequently given to Lopez.

Count 12 concerned extortion of Eduardo Gonzalez ("Droopy"). Neslen testified Gonzalez called Salazar's wife Darlene Vasquez and made arrangements to deliver money to her. Vasquez told Solorio she received $400 from "Droopy." Surveillance disclosed Vasquez gave $500 to Lopez at a restaurant in South Gate. Salazar testified Lopez used his phone to tell Gonzalez he was to continue making payments to Salazar.

The trial court instructed the jury with CALJIC Nos. 14.70 (defining extortion), 14.71 (what constitutes threats inducing fear), 14.72 (meaning of term "unlawful injury"), and 14.73 (causal relation between fear and consent).

## B. Discussion.

Extortion is the obtaining of property or other consideration from another with his or her consent induced by the wrongful use of force or fear. (§ 518, subd. (a).) Section 519 provides that "fear" may be induced by a threat of any one of the following: (1) To inflict an unlawful injury to the person or property of the individual threatened or of a third person; (2) To accuse the individual threatened, or a relative of the threatened individual, of a crime; (3) To expose, or to impute to the victim a deformity, disgrace, or crime; (4) To expose a secret affecting the victim and (5) To report his, her, or their immigration status or suspected immigration status. Extortion is a specific intent crime, and thus guilt depends on the intent of the person who makes the threat and not the effect the threat has on the victim. (*People v. Umana* (2006) 138 Cal.App.4th 625, 641.)

"In order to establish extortion, 'the wrongful use of force or fear must be the operating or controlling cause compelling the victim's consent to surrender the thing to the extortionist.'" (*Chan v. Lund* (2010) 188 Cal.App.4th 1159, 1171.) The threat may be implied from all the circumstances: "'No precise or particular form of words is necessary in order to constitute a threat under the circumstances. Threats can be made by innuendo and the circumstances under which the threat is uttered and the relations between [the defendant] and the [target of the threats] may be taken into consideration in making a determination of the question involved.' [Citations.] . . .'The more

46

vague and general the terms of the accusation the better it would subserve the purpose of the accuser in magnifying the fears of his victim, and the better also it would serve to protect him in the event of the failure to accomplish his extortion and of a prosecution for his attempted crime.'" (*Stenehjem v. Sareen* (2014) 226 Cal.App.4th 1405, 1424; see also *People v. Choynski* (1892) 95 Cal. 640, 642 [persons guilty of extortion "seldom possess the hardihood to speak out boldly and plainly, but deal in mysterious and ambiguous phrases"].) The threat may be implied from the facts and context. (*People v. Massengale* (1968) 261 Cal.App.2d 758, 764–765.) "The more vague and general his actions and statements the better they will serve his purpose in magnifying the fear of his victim and the better also it will serve to protect him in the event of the failure to accomplish his extortion and of a prosecution of his attempted crime. [Citations.]" (*Ibid.*)

Section 182 prohibits a conspiracy by two or more people to "commit any crime." (§ 182, subd. (a)(1).) Conspiracy requires that the defendant and another person had the specific intent to agree or conspire to commit an offense, as well as the specific intent to commit the elements of that offense, together with proof of the commission of an overt act by one or more of the parties to such agreement in furtherance of the conspiracy. (*People v. Johnson* (2013) 57 Cal.4th 250, 257.) Both attempt and conspiracy cover inchoate crimes and allow intervention before the underlying crime has been completed. (*Ibid.*) However, conspiracy law attaches culpability at an earlier point than attempt. "'Conspiracy is an inchoate offense, the essence of which is an agreement to commit an unlawful act.' [Citations.] Conspiracy separately punishes not the completed crime, or even its attempt." Rather, the crime of conspiracy punishes the

47

agreement itself and does not require the commission of the substantive offense (*Ibid.*) A conspiracy may be implied from the circumstances, including the conduct, relationships, and activities of the conspirators. (*People v. Bollaert* (2016) 248 Cal.App.4th 699, 725.) A co-conspirator shares in the guilt of the principal. (*People v. Maciel* (2013) 57 Cal.4th 482, 515.)

In evaluating sufficiency of the evidence, we must view the evidence in the light most favorable to the People and must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. (*People v. Perez* (2010) 50 Cal.4th 222, 229.) Circumstantial evidence may be sufficient to connect a defendant with the crime and to prove his guilt beyond a reasonable doubt. (*People v. Abilez* (2007) 41 Cal.4th 472, 504.)

Here, the prosecution relied on the threat to do an unlawful injury to the person or property of the person threatened. (§ 519, subd. (1).) This threat was made in the context of the Mexican Mafia's control of neighborhoods, its imprimatur of "13" giving local gangs status and protection, and the risk of consequences (harm or death) if "taxes" were not paid. Thus, although there was no evidence of specific words uttered to the victims, the exchange of cash in this context constituted substantial evidence.

Defendants rely on *People v. Ochoa* (2016) 2 Cal.App.5th 1227, where the evidence was insufficient to show that defendant attempted to extort property from a food truck worker. The defendant, a gang member, asked the worker for "rent," but the worker referred the defendant to the food truck owner. A few minutes later, the defendant approached the worker from behind, tapped his shoulder, and shot him without exchanging words. At issue in *Ochoa* was the charging document: the information did

not identify the business (nor its owner) as a victim of attempted extortion. Instead, the information identified the worker as the only victim. Because the information misidentified the victim of the attempted extortion, it failed to provide the defendant with legally sufficient notice of the charge against him. In *Ochoa*, the food truck owner was unaware of a demand for property or an implied threat that defendant had made, and thus no extortion occurred. (*Id.* at pp. 1231–1232.) Here, there is ample evidence the victims knew of the threats: Salazar testified he told the victims they had to pay.

## V.   SUBSTANTIAL EVIDENCE OF ATTEMPTED MURDER (SOLORIO)

Solorio contends insufficient evidence supports his convictions for attempted murders of James Arellano and Daniel Bugarin because, at most, the evidence showed preparation and thus fails to show the direct movement towards commission of the offense.

### A.   Factual Background.

#### 1.   *James Arellano* (Count 16)

In April 2010, Salazar suspected that Arellano, a tax collector, was keeping tax money, and told Solorio. Arellano was in a county jail under the control of Mexican Mafia member Lalo Martinez, and was housed in the same unit as Hector Ornelas, one of Salazar's fellow gang members. Through an intermediary, Solorio texted Martinez to obtain authorization to kill Arellano: "James Hernandez Arellano aka Lil Danger, 4M Marijuanos 13. Hard Candy." In April 2010, Arellano was attacked and stabbed in jail by inmates. One of the attackers told a deputy he did not

want to attack Arellano, but he had been ordered to do so. Arellano believed the order to attack him came from Solorio.

The prosecution argued at trial that the text message constituted the overt act to support the attempted murder charge. The court instructed the jury in line with this theory, "On April 7, 2010, defendant Solorio sent a text message . . . ordering a deadly attack on James Arellano. The text read 'James Arellano also known as Lil danger 4m marijuana locos 13. Hard candy.'"

### 2. *Daniel Bugarin* (Count 18)

In January 2009, Solorio told "Smokey" Martin that he was looking for "Wacky" (Bugarin) from South Side Pasadena, who was in the county jail. Solorio stated that Wacky was not on "good status" and he had the paperwork on Bugarin. Solorio wanted to make sure they had "scissors and shit there too . . . because I want it done right." Later that month, Solorio told Smokey that he had received the "work" and it was "a go" but that they should hold off until higher-ups could vouch for the work.

In February 2009, Bugarin was stabbed by gang members affiliated with the Mexican Mafia while in custody. Bugarin believed Solorio ordered the attack because Solorio was in charge of the territory where Bugarin operated.

The jury was instructed on an aiding and abetting theory for the attempted murders.

### B. Discussion.

Murder is the unlawful killing of a human being with malice aforethought. (§ 187, subd. (a); *People v. Smith* (2005) 37 Cal.4th 733, 739.) "Attempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing." (*People v. Lee* (2003) 31

Cal.4th 613, 623.) Liability for an attempt does not require that any element of the underlying offense be accomplished. "'[A] person may be convicted of an attempt to commit a crime he never could have completed under the circumstances.' [Citations.]" (*People v. Moses* (2020) 10 Cal.5th 893, 899.)

The overt act element of attempt is satisfied when "a direct but ineffectual act [has been] done toward [a crime's] commission." (§ 21a.) "The overt act element of attempt requires conduct that goes beyond 'mere preparation' and 'show[s] that [defendant] is putting his or her plan into action.' [Citations.]" (*People v. Watkins* (2012) 55 Cal.4th 999, 1021.) The boundaries of attempt require an act sufficiently close to completing the crime. "For example, if a person decides to commit murder but does nothing more, he has committed no crime. If he buys a gun and plans the shooting, but does no more, he will not be guilty of attempt. But if he goes beyond preparation and planning and does an act sufficiently close to completing the crime, like rushing up to his intended victim with the gun drawn, that act may constitute an attempt to commit murder." (*People v. Johnson, supra,* 57 Cal.4th at p. 258.)

"Although a definitive test has proved elusive, we have long recognized that '[w]henever the design of a person to commit crime is clearly shown, slight acts in furtherance of the design will constitute an attempt.' [Citations.]" (*People v. Superior Court* (*Decker*) (2007) 41 Cal.4th 1, 8.) "Indeed, where (as here) the crime involves concerted action—and hence a greater likelihood that the criminal objective will be accomplished [citation]—there is a greater urgency for intervention by the state at an earlier stage in the course of that conduct. [Citation.]" (*Id.* at pp. 10–11.) The line between mere preparation and conduct fulfilling the act

element of attempt is difficult to determine. (*People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1192.) It is a question of degree and depends upon the facts and circumstances of a particular case. (*Ibid.*)

Here, on Count 16, Solorio contends the mere sending of the text message seeking authorization to kill Arellano does not rise to the level of attempt. On Count 18, he argues there is no evidence he had done all that he could to facilitate Bugarin's stabbing. We disagree. Solorio's argument ignores the fact the matter was tried on an aiding and abetting theory.

"'[A]n aider and abettor with the necessary mental state is guilty of the intended crime.'" (*People v. Chiu* (2014) 59 Cal.4th 155, 158.) "'A "person aids and abets the commission of a crime when he or she, acting with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages or instigates, the commission of the crime."' [Citation.] '[T]o be guilty of attempted murder as an aider and abettor, a person must give aid or encouragement with knowledge of the direct perpetrator's intent to kill and with the purpose of facilitating the direct perpetrator's accomplishment of the intended killing— which means that the person guilty of attempted murder as an aider and abettor must intend to kill.'" (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1054.)

Solorio facilitated both attempted murders. With respect to Arellano, he set the wheels in motion by obtaining authorization, thereby giving aid and encouragement to the actual perpetrators of the attack. Similarly, with respect to Bugarin, Solorio set up the attack and made sure before it occurred that everything was

in order, namely, that the actual perpetrators had implements to stab Bugarin.

## VI.    CLAIMED INSTRUCTIONAL ERROR: ACCOMPLICE LIABILITY (CALJIC NO. 3.00)

Solorio and Lopez argue the trial court erred in giving CALJIC No. 3.00 on accomplice (aider and abettor) liability because the instruction misstates the law by stating aiders and abettors are equally culpable, when an aider and abettor may be less culpable.

### A.    Factual Background.

The trial court gave CALJIC No. 3.00, as follows:

"Persons who are involved in committing or attempting to commit a crime are referred to as principals in that crime. Each principal, regardless of the extent or manner of participation *is equally guilty*. Principals include:

"1. Those who directly and actively commit or attempt to commit the act constituting the crime, or

"2. Those who aid and abet the commission or attempted commission of the crime.

"When the crime charged is either murder or attempted murder, the aider and abettor's guilt is determined by the combined acts of all the participants as well as that person's own mental state. If the aider and abettor's mental state is more culpable than that of the actual perpetrator, that person's *guilt may be greater* than that of the actual perpetrator. Similarly, the aider and abettor's *guilt may be less* than the perpetrator's, if the aider and abettor has a less culpable mental state." (CALJIC 3.00 (emphasis added.))

### B. Discussion.

As a threshold matter, the Attorney General asserts that as the instruction was a correct statement of the law, the claim of instructional error was not preserved for appeal because defense counsel neither objected to, nor sought modification of, the instruction. Generally, a party may not complain on appeal that an instruction is incomplete or confusing unless the party has requested appropriate clarifying or amplifying language. (*People v. Castaneda* (2011) 51 Cal.4th 1292, 1348; *People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1163.)

We agree. The "equally guilty" language of CALJIC 3.00 is a correct statement of the law, and therefore appellants were required to request a modification or clarification. (*People v. Nilsson* (2015) 242 Cal.App.4th 1, 25–26.) Appellants forfeited this argument because they did not raise it below, which would have given the trial court an opportunity to clarify the instruction and thereby avoid any possible ambiguities in the instruction as applied to this case.

## VII. CLAIMED INSTRUCTIONAL ERROR: INTENT TO KILL, CONSPIRACY TO COMMIT MURDER (CALJIC No. 6.11)

Lopez argues his convictions for murder and attempted murder (Counts 2, 17 and 19) must be reversed because conspiracy to commit murder requires that each conspirator have the specific intent to commit murder, and the jury was incorrectly instructed with CALJIC 6.11 that it could convict him without the required mental state by relying on the natural and probable consequence of conspiring to commit extortion. Further, he

54

asserts SB 1437 implicitly repealed attempted murder based upon any natural and probable consequence theory.

## A. Factual Background: Jury Instructions.

The trial court instructed the jury on conspiracy to commit murder.

"A conspiracy to commit murder is an agreement entered into between two or more persons with the specific intent to agree to commit the crime of murder and with the further specific intent to commit that murder, followed by an overt act committed in this state by one or more of the parties for the purpose of accomplishing the object of the agreement. Conspiracy is a crime. [¶] The crime of conspiracy to commit murder requires proof that the conspirators harbored express malice aforethought, namely, the specific intent to kill unlawfully another human being." (CALJIC No. 8.69)

The jury was also instructed: "A member of a conspiracy is not only guilty of the particular crime that to his knowledge his confederates agreed to and did commit, *but is also liable for the natural and probable consequences* of any crime or act of a co-conspirator to further the object of the conspiracy, even though that crime or act was not intended as a part of the agreed upon objective and even though he was not present at the time of the commission of that crime or act. [¶] You must determine whether the defendant is guilty as a member of a conspiracy to commit the originally agreed upon crime or crimes, and, if so, whether the crimes alleged in Counts 1, 16 & 18 were perpetrated by a co-conspirator in furtherance of that conspiracy and *was a natural and probable consequence of the agreed upon criminal objective of that conspiracy.* [¶] *In determining whether a consequence is "natural and probable" you must apply an objective test based not*

55

*on what the defendant actually intended but on what a person of reasonable and ordinary prudence would have expected would be likely to occur. The issue is to be decided in light of all of the circumstances surrounding the incident. A 'natural consequence' is one which is within the normal range of outcomes that may be reasonably expected to occur if nothing unusual has intervened. 'Probable' means likely to happen.*" (CALJIC 6.11, emphasis added.)

The jury was also properly instructed on an aiding and abetting theory with CALJIC No. 3.00 (as discussed *ante*). The jury was also instructed with CALJIC No. 3.01, which defines aiding and abetting: "A person aids and abets the commission or attempted commission of a crime when he or she: [¶] (1) With knowledge of the unlawful purpose of the perpetrator, and [¶] (2) With the intent or purpose of committing or encouraging or facilitating the commission of the crime, and[¶] (3) By act or advice, aids, promotes, encourages or instigates the commission of the crime. [¶] A person who aids and abets the commission or attempted commission of a crime need not be present at the scene of the crime. To be guilty as an aider or abettor, the defendant's intent or purpose of committing or encouraging or facilitating the commission of the crime by the perpetrator must be formed before or during the commission of the crime. [¶] Mere knowledge that a crime is being committed and the failure to prevent it does not amount to aiding and abetting."

In closing argument, the prosecution argued extensively on the natural and probable consequences before the jury.

## 2. *Lopez's Claim is Cognizable On Direct Appeal.*

Prior to the enactment of Senate Bill 1437, "an aider and abettor [was not required to] personally possess malice, express or implied, to be convicted of second-degree murder under a natural and probable consequences theory." (*People v. Gentile* (2020) 10 Cal.5th 830, 847 (*Gentile*).) Indeed, "'the mens rea of the aider and abettor with respect to [the nontarget] offense [was] irrelevant [because] culpability [was] imposed simply because a reasonable person could have foreseen the commission of the nontarget crime.'" (*People v. Chiu, supra,* 59 Cal.4th at p. 164.)

Effective January 1, 2019, Senate Bill 1437 amended section 188 to provide that, outside the context of felony murder, "in order to be convicted of murder, a principal in a crime shall act with malice aforethought. Malice shall not be imputed to a person based solely on his or her participation in a crime." (Stats. 2018, ch. 1015 § 2.) "The natural and probable consequences doctrine is incompatible with this requirement. . . . ." (*Gentile, supra*, 10 Cal.5th at p. 847.) Accordingly, our Supreme Court has concluded that "Senate Bill 1437 eliminates natural and probable consequences liability for murder regardless of degree." (*Id*. at pp. 847–848.)

Senate Bill 1437 also enacted section 1170.95, subdivision (a), which permits a person convicted of murder under a natural and probable consequences theory to petition the sentencing court to have his or her murder conviction vacated and to be resentenced on any remaining counts. A person is entitled to section 1170.95 relief if, among other things, he or she "could not be convicted of first or second degree murder" following the enactment of Senate Bill 1437. (§ 1170.95, subd. (a)(3).)

57

In *Gentile*, our Supreme Court held that "[t]he ameliorative provisions of Senate Bill 1437 do not apply on direct appeal to nonfinal convictions obtained before the law became effective. Such convictions may be challenged on Senate Bill 1437 grounds only through a petition filed in the sentencing court under section 1170.95." (*Gentile, supra*, 10 Cal.5th at pp. 851–852.)

In 2021, while this case was pending on appeal, the Legislature enacted Senate Bill 775. Among other things, Senate Bill 775 amends section 1170.95 to provide that "[a] person convicted of murder, attempted murder, or manslaughter whose conviction is not final may challenge on direct appeal the validity of that conviction based on the changes made to Sections 188 and 189 by Senate Bill 1437 (Chapter 1015 of the Statutes of 2018)." (Stats. 2021, ch. 551, § 2.) Senate Bill 775 took effect on January 1, 2022. (Cal. Const., art. IV, § 8, subd. (c)(1) [absent urgency clause, statutory amendments enacted during regular session of the Legislature become effective on January 1 of the following year].)

Because defendants' judgment is not yet final, we address the impact of Senate Bill 1437 on their convictions. (*People v. Vieira* (2005) 35 Cal.4th 264, 306 [a "judgment is not final until the time for petitioning for a writ of certiorari in the United States Supreme Court has passed"]; *People v. Lizarraga* (2020) 56 Cal.App.5th 201, 206 ["a petition for writ of certiorari is timely filed within 90 days after entry of judgment of a state court of last resort"].)

**B. The Erroneous Instruction on Natural and Probable Cause Was Harmless Beyond a Reasonable Doubt.**

### 1. *Conspiracy to Commit Murder.*

Conspiracy to commit murder requires the specific intent to kill. (*People v. Swain* (1996) 12 Cal.4th 593, 602.) Intent to kill for purposes of murder, also known as express malice, is shown when the assailant either desires the victim's death or knows to a substantial certainty that death will occur. (*People v. Smith* (2005) 37 Cal.4th 733, 739.) Intent to kill may "be inferred from the defendant's acts and the circumstances of the crime. (*Id.* at p. 741.)

Guilt as a direct aider and abettor requires: (1) a crime committed by the direct perpetrator; (2) knowledge of the direct perpetrator's intent to commit the crime; (3) intent to assist in committing the crime; and (4) conduct that in fact assists in committing the crime. (*People v. Perez* (2005) 35 Cal.4th 1219, 1225.) The defendant must not only know the direct perpetrator's intent, he or she must share that intent. (*People v. Beeman* (1984) 35 Cal.3d 547, 560.) "Senate Bill 1437 did not change accomplice liability for murder under direct aiding and abetting principles." (*People v. Jenkins* (2021) 70 Cal.App.5th 924, 931.) "'One who directly aids and abets another who commits murder is thus liable for murder under the new law just as he or she was liable under the old law.'" (*Ibid.*)

"Liability for intentional, target offenses is known as 'direct' aider and abettor liability; liability for unintentional, nontarget offenses is known as the ""natural and probable consequences' doctrine."" (*In re Loza* (2018) 27 Cal.App.5th 797, 801.) "Senate Bill 1437 does not eliminate direct aiding and

59

abetting liability for murder because a direct aider and abettor to murder must possess malice aforethought." (*Gentile, supra*, 10 Cal.5th at p. 848.)

"Under the natural and probable consequences theory of aiding and abetting a murder, a defendant can be found guilty of murder if he or she aids and abets a crime (i.e., the target crime) and murder (i.e., the nontarget crime) is a natural and probable consequence of that target crime." (*People v. Chavez* (2018) 22 Cal.App.5th 663, 683.) Here, the target offense was first degree murder because appellants were convicted of conspiracy to commit first degree murder. "[A] conviction of conspiracy to commit murder requires a finding of intent to kill[.]" (*People v. Swain* (1996) 12 Cal.4th 593, 607.) "'[A]ll conspiracy to commit murder is necessarily conspiracy to commit premeditated and deliberated first degree murder.'" (*People v. Beck and Cruz* (2019) 8 Cal.5th 548, 641.)

Thus, Solorio and Lopez can be liable for Knight's murder on a theory they directly aided and abetted the offense, and the same principles would apply to the attempted murder and extortion charges.

### 2. *Harmless Error.*

The Supreme Court has distinguished two categories of incorrect theories of jury instructions. (*People v. Aledamat* (2019) 8 Cal.5th 1, 7 (*Aledamat*); *People v. Guiton* (1993) 4 Cal.4th 1116, 1128.) A factually inadequate theory "is an otherwise valid legal theory that is not supported by the facts or evidence in a case." (*Aledamat*, at pp. 7–8.) A legally inadequate theory "is incorrect because it is contrary to law." (*Id.* at p. 7.) We presume jurors are able to evaluate and ignore factually incorrect theories. (*Id.* at p. 8; *Guiton*, at p. 1125.) Legally incorrect theories require a more

stringent standard of prejudice because jurors are less able to identify an incorrect statement of the law. (*Aledamat*, at p. 8; *Guiton*, at p. 1125.)

The Supreme Court has held that the *Chapman*[10] harmless error standard applies to an "alternative-theory error" like the one here. (*Aledamat*, supra, 8 Cal.5th at p. 13.) The Supreme Court stated that the "reviewing court must reverse the conviction unless, after examining the entire cause, including the evidence, and considering all relevant circumstances, it determines the error was harmless beyond a reasonable doubt." (*Ibid*.) In determining under *Chapman* "whether the error was harmless, the reviewing court is not limited to a review of the verdict itself. An examination of the actual verdict may be sufficient to demonstrate harmlessness, but it is not necessary." (*Ibid*.) The reviewing court should consider the likelihood the jury applied the incorrect instruction, "not simply the strength of the evidence to support a guilty verdict using the correct instruction." (*People v. Thompkins* (2020) 50 Cal.App.5th 365, 399.)

### C. Application.

Here, we conclude any error was harmless beyond a reasonable doubt because is not possible that the jury relied on the doctrine of natural and probable consequences to find defendants guilty of murder, attempted murder, and extortion. Instead, the facts establish that the crimes committed were not the inadvertent foreseeable outcomes of appellants' criminal behavior. Rather, they were the planned objectives of the conspiracy and therefore liability properly attached under the aider and abettor doctrine.

---

[10]     *Chapman v. California* (1967) 386 U.S. 18.

61

"Natural and probable consequences" is defined as "[a] natural and probable consequence is one that a reasonable person would know is likely to happen if nothing unusual intervenes." (CALCRIM No. 402, emphasis omitted.) Here, the doctrine would not apply because the murder and extortion offenses were not the unintended results of defendants' conduct, but instead were the very results they envisioned. So, we conclude the jury necessarily relied on the viable aiding and abetting theory upon which they were instructed.

Accordingly, the record establishes appellants were convicted under a theory that remains valid under section 189, as amended by Senate Bill No. 1437.

## VIII. CLAIMED INSTRUCTIONAL ERROR: FAILURE TO SUA SPONTE INSTRUCT WITH CALJIC 6.24.

McMorries argues the trial court erred in failing to instruct the jury with CALJIC No. 6.24 regarding the use of co-conspirator's statements. McMorries contends this failure was prejudicial because No. 6.24 provides the foundational requirements of the existence of a conspiracy, and he contends such evidence was slim. He was only captured on seven of the wiretapped phone calls, in two conversations, a recorded cell communication, and two body wire conversations; all other statements were admitted under Evidence Code section 1223, the coconspirator exception to the hearsay rule. Alternatively, he asserts that if there is no sua sponte duty, he argues his trial counsel was ineffective for failing to request the instruction.

### A.     Procedural Background.

Although statements of conspirators were admitted during trial pursuant to Evidence Code section 1223, trial counsel did

62

not request instruction No. 6.24, which sets forth the foundational requirements for consideration of such hearsay statements. The trial court did not instruct with this instruction. CALJIC 6.24 provides:

"Evidence of a statement made by one alleged conspirator other than at this trial shall not be considered by you as against another alleged conspirator unless you determine by a preponderance of the evidence:

"1. That from other independent evidence that at the time the statement was made a conspiracy to commit a crime existed;

"2. That the statement was made while the person making the statement was participating in the conspiracy;

"3. That the statement was made in furtherance of the objective of the conspiracy, and was made before or during the time when the party against whom it was offered was participating in the conspiracy.

"The word "statement" as used in this instruction includes any oral or written verbal expression or the nonverbal conduct of a person intended by that person as a substitute for oral or written verbal expression."

The trial court gave other instructions regarding the charged conspiracy: CALJIC No. 6.10 (conspiracy and overt act defined), CALJIC No. 6.11 (conspiracy, joint responsibility), CALJIC No. 6.12 (proof of express agreement of conspiracy unnecessary), CALJIC No. 6.13 (association alone does not prove membership in conspiracy), CALJIC No. 6.14 (acquaintance with all co-conspirators not necessary), CALJIC No. 6.18 (commission of act in furtherance of conspiracy does not itself prove membership in conspiracy), and CALJIC No. 6.22 (conspiracy, case must be considered as to each defendant).

In addition, the court gave CALJIC Nos. 6.16 and 6.19:

"Where a conspirator commits an act or makes a declaration which is neither in furtherance of the object of the conspiracy nor the natural and probable consequence of an attempt to attain that object, he alone is responsible for and is bound by that act or declaration, and no criminal responsibility therefor attaches to any of his confederates." (CALJIC No. 6.16)

"Every person who joins a conspiracy after its formation is liable for and bound by the acts committed and declarations made by other members in pursuance and furtherance of the conspiracy during the time that he or she is a member of the conspiracy.

"A person who joins a conspiracy after its formation is not liable or bound by the acts of the co-conspirators or for any crime committed by the co-conspirators before that person joins and becomes a member of the conspiracy.

"Evidence of any acts done or declarations made by other conspirators prior to the time that person becomes a member of the conspiracy may be considered by you in determining the nature, objectives and purposes of the conspiracy, but for no other purpose." (CALJIC No. 6.19)

## B.     Any Error in Failing to Instruct Was Harmless.

Hearsay evidence is generally inadmissible. Hearsay statements by coconspirators, however, may nevertheless be admitted against a party if there is independent evidence to establish prima facie the existence of a conspiracy. Once independent proof of a conspiracy has been shown, three preliminary facts must be established: "'(1) that the declarant was participating in a conspiracy at the time of the declaration; (2) that the declaration was in furtherance of the objective of that

64

conspiracy; and (3) that at the time of the declaration the party against whom the evidence is offered was participating or would later participate in the conspiracy.'" (*People v. Hardy* (1992) 2 Cal.4th 86, 139; Evid. Code, § 1223, subd. (c).)

Although the existence of the conspiracy must be shown by independent proof, such showing need only be prima facie evidence of the conspiracy. This prima facie showing may be circumstantial and may be by means of any competent evidence which tends to show that a conspiracy existed. (*People v. Beck and Cruz, supra*, 8 Cal.5th at pp. 627.) Furthermore, the independent proof required to establish the existence of a conspiracy may consist of uncorroborated accomplice testimony. (*Id.* at p. 628.)

"We review de novo a claim that the trial court failed to properly instruct the jury on the applicable principles of law." (*People v. Canizalez* (2011) 197 Cal.App.4th 832, 850.) "It is settled that in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence. [Citations.] The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case." (*People v. St. Martin* (1970) 1 Cal.3d 524, 531.)

Two courts have held, without analysis of the court's sua sponte duty to instruct, that the failure to instruct with CALJIC No. 6.24 is harmless error. (*People v. Sully* (1991) 53 Cal.3d 1195, 1231–1232 [assuming CALJIC No. 6.24 should have been given, failure to do so harmless error]; *People v. Prieto* (2003) 30 Cal.4th 226, 251–252 [same].) We similarly need not determine whether there was a sua sponte duty to instruct with CALJIC No. 6.24.

65

Although given the admissibility of the coconspirators' statements pursuant to Evidence Code section 1223, CALJIC No. 6.24 would have been appropriate, any failure to instruct was harmless.

Here, in any event, numerous statements independently established the existence of the conspiracies to commit murder and extortion. McMorries made numerous statements to Solorio, Lopez and Salazar regarding the gang's ongoing extortion, Knight's failure to remit taxes, and planning and execution of Knight's murder. Finally, viewing the extensive instructions on conspiracy as a whole, it is not likely that the jury failed to make the foundational finding that conspiracies existed and these hearsay statements were made in furtherance of the conspiracy.

## C.    Counsel Was Not Ineffective.

The right to effective assistance of counsel derives from the Sixth Amendment right to assistance of counsel. (*Strickland v. Washington* (1984) 466 U.S. 668, 684-686.) To state a claim that counsel rendered constitutionally ineffective assistance, "'the defendant must first show counsel's performance was deficient, in that it fell below an objective standard of reasonableness under prevailing professional norms. Second, the defendant must show resulting prejudice, [namely], a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different.'" (*People v. Hoyt* (2020) 8 Cal.5th 892, 958.)

"When examining an ineffective assistance claim, a reviewing court defers to counsel's reasonable tactical decisions, and there is a presumption counsel acted within the wide range of reasonable professional assistance." (*People v. Mai* (2013) 57 Cal.4th 986, 1009.) "On direct appeal, a conviction will be

reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation. All other claims of ineffective assistance are more appropriately resolved in a habeas corpus proceeding." (*Ibid.*)

Here, appellant cannot demonstrate prejudice on this record because any failure to request this instruction was harmless as discussed above.

## IX.    NEW TRIAL MOTION ON EXTORTION COUNTS.

Appellants McMorries and Solorio argue that the trial court abused its discretion in refusing to grant their new trial motion on the extortion counts based upon what they contend was inflammatory language inadvertently included with a transcript of their phone conversations. (Counts 3, 5 and 12.)

### A.    Factual Background.

Expert testimony at trial on the operations of the Mexican Mafia established that its primary activity was extortion. Before trial, Lopez moved to exclude the use of the word "extortion" to describe the collection and payment of taxes or rent money. The trial court granted the motion and ordered the experts would not use the word "extortion" when testifying to facts or hypotheticals. Experts would only be permitted to use terms such as "payment of rent," and "money paid."

During trial, the prosecution played for the jury audio recordings of conversations between Lopez and Salazar regarding tax collections. Transcripts of the recordings were given to the jurors. However, the transcripts contained a footer that contained

the notation "Meet with Ronald Dave Lopez to hand over $2,300 of extortion money." Due to use of the word "extortion," the prosecution asked the trial court to admonish the jury. Defense counsel asked for fresh copies of the transcripts to be provided to the jurors, but the prosecution argued that rather than exchange the transcripts for clean copies (because the jurors had already made notations on their copies), the prosecution asked for a limiting instruction. The trial court gave the jurors black markers and asked them to cross out the footers, and stated it would provide a limiting instruction.

Appellants moved for mistrial on the extortion counts. The trial court denied the motion, stating, "I don't think this is so prejudicial that we have somehow tainted the jurors to the point where they can't reach a fair and just verdict. The court instructed the jury: "If you recall when we were doing voir dire, what I told you was that we're putting evidence into an imaginary box, and we're talking about evidence that is coming from this witness stand, also the audiotapes that you're hearing. that is what is going into the imaginary box. [¶] There is something that is not going into the imaginary box. So if you go back to page—or tab 14 in this same book, tab 14, and you look at the bottom—the very bottom right where it says 2 of 12, 3 of 12, the paging. there is an extraneous language there with just a notation made by somebody who was doing the transcribing or something. That is not going into the imaginary box; so you can't consider it. [¶] . . . [¶] When you deliberate you're not to consider what is below the black line. That's why I'm having you take it out, to make it easier for you to understand that that is not going into the imaginary box. You are not allowed to consider that sentence on any of those pages."

## B.    Discussion

"""'A mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction. [Citation.] Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions. [Citation.]" [Citation.] A motion for a mistrial should be granted when "'"a [defendant's] chances of receiving a fair trial have been irreparably damaged."""" (*People v. Silveria and Travis* (2020) 10 Cal.5th 195, 298–299.) The defendant bears the burden to show the trial court abused its discretion in denying his motion for a mistrial. (*People v. Maury* (2003) 30 Cal.4th 342, 434–437.) We review a trial court's ruling on a motion for a mistrial under the deferential abuse of discretion standard. (*People v. Schultz* (2020) 10 Cal.5th 623, 673.)

In *People v. Navarette* (2010) 181 Cal.App.4th 828, upon which defendants rely, the defendant was charged with committing a lewd act on a four-year-old. (*Id.* at p. 830.) The trial court granted the defense motion to suppress any reference to defendant's confession that was obtained in violation of the defendant's *Miranda rights*. (*Id.* at p. 831.) Upset with the court's ruling, one of the detectives "promised he 'was going to show' the court." (*Id.* at p. 832.) During that detective's testimony, he was asked why he had decided not to conduct DNA testing on swabs taken from the victim's body. (*Id.* at p. 831.) The detective answered, "'Well, for several reasons, the first of which it's a court rule that the defendant's statement is inadmissible. So I can't state the first reason.'" (*Ibid.*) The trial court struck the testimony and gave a curative instruction to the jury. (*Id.* at pp. 831–832.) On appeal, the court held the curative instruction was

insufficient because the jury could have reasonably inferred from the detective's testimony that the defendant "had confessed or otherwise incriminated himself, rendering DNA evidence unnecessary." (*Id*. at p. 834.) The court further found the trial court's curative instructions could not undo the damage inflicted by the detective's testimony because the instruction "did not break the link the jury was likely to perceive between a 'statement' and a 'confession' in the context of other evidence the jury heard." (*Ibid*.)

Appellants contend the description in the footer of the transcript provided written confirmation of the prosecution's interpretation of the coded communications. Under these circumstances, they argue, the instruction was insufficient to break the link the jury was likely to perceive about the exchange of money. Further, the remedy of marking out the footer did not remedy the situation but instead highlighted the problem.

We disagree. Unlike *Navarette,* where the prohibited material was deliberately inserted into evidence, the word "extortion" was heard at trial in other, proper contexts. The jury had already listened to experts describe that the main operation of the Mexican Mafia was extortion. Defendants were charged with violations of sections 518 and 519 and instructed on "extortion." Serrano testified to his participation in "extortion." Given the ubiquity of the word "extortion" at trial, and the crimes with which defendants were changed, the erroneous inclusion of the word in a footer did not deprive defendants of a fair trial. This is particularly true because the judge took curative steps to ensure the jurors understood the footer was not evidence. We find no abuse of discretion in the trial court's decision to deny the new trial motion.

# X.   *PITCHESS* REVIEW.

Lopez requests this court independently review the record of the in-camera hearing on his *Pitchess*[11] motion. He also requests review of the sealed materials to determine what documents were produced or not produced for the trial court's review and the sufficiency of any explanation of such production. The People do not object to our review.

## A. Factual Background

On April 11, 2014, Lopez filed a motion for an order to produce documents for inspection and a motion for pretrial discovery of law enforcement personnel records for Neslen for the previous five years concerning any accusations of violation of civil liberties, detention without reasonable cause, falsifying evidence, misconduct, excessive use of force, or aiding and abetting another officer's misconduct. (Evid. Code, § 1043.) Lopez also sought discovery of former *Pitchess* motions filed against Neslen.

Lopez alleged in his supporting affidavits for the state wiretaps, that Neslen had asserted he only contacted one informant and no other informants were known ("no other informants, other than those detailed in this affidavit, are currently known or available with the capacity to infiltrate these target subjects." This sole informant was used to justify the necessity of the wiretaps. Lopez later learned that in an application for a federal wiretap, Neslen represented he had six (and later eight) additional informants.

The prosecution opposed, principally asserting that Lopez failed to comply with the good cause and materiality

---

[11]   *Pitchess v. Superior Court* (1974) 11 Cal.3d 531.

71

requirements of Evidence Code section 1043, subdivision (b)(3) because the supporting declaration was deficient. The reasons for the discovery, namely, the different number of informants Neslen relied on for the wiretap authorizations, was insufficient.

On June 4, 2014, after argument on the motion, the trial court conducted an in camera *Pitchess* hearing to review the officer's files. The hearing was recorded, transcribed, and filed under seal. At the in-camera hearing, outside the presence of the parties, the custodians of records for the Bell Gardens Police Department testified under oath about the categories of documents they reviewed. The trial court found no discoverable materials.

## B.    Discussion.

"'[A] criminal defendant may, in some circumstances, compel the discovery of evidence in [a] law enforcement officer's personnel file that is relevant to the defendant's ability to defend against a criminal charge.'" (*Garcia v. Superior Court* (2007) 42 Cal.4th 63, 69.) By providing that the trial court should conduct an in-camera review, the *Pitchess* review process balances the defendant's need for disclosure of relevant information with the law enforcement officer's legitimate expectation of privacy in his or her personnel records. (*Ibid.*)

If after the defendant files a *Pitchess* motion, "the trial court concludes the defendant has fulfilled [the statutory] prerequisites and made a showing of good cause, the custodian of records should bring to court all documents 'potentially relevant' to the defendant's motion. [Citation.] The trial court 'shall examine the information in chambers' . . . 'out of the presence and hearing of all persons except the person authorized [to possess the records] and such other persons [the custodian of records] is

willing to have present' [Citations.]. Subject to statutory exceptions and limitations . . . the trial court should then disclose to the defendant 'such information [that] is relevant to the subject matter involved in the pending litigation.'" (*People v. Mooc* (2001) 26 Cal.4th 1216, 1226 (*Mooc*).)

We review the trial court's decision not to order the release of personnel records for abuse of discretion. (*People v. Winbush* (2017) 2 Cal.5th 402, 424; *Mooc, supra*, 26 Cal.4th at p. 1228.) If a trial court is found to have abused its discretion in denying Pitchess discovery, a defendant is not entitled to relief unless he can demonstrate a reasonable probability of a different outcome had the evidence been disclosed. (*People v. Gaines* (2009) 46 Cal.4th 172, 182–183.)

Having reviewed the record of defendant's in-camera *Pitchess* motion hearing, we find no abuse of discretion. The court appropriately denied the motion. (See *Mooc, supra*, 26 Cal.4th at pp. 1228–1232.)

## XI.  CLAIMED CUMULATIVE ERROR.

Appellants argue that even if we conclude the individual errors at trial do not require reversal or retrial, the cumulation of such errors deprived them of a fair trial. Under the cumulative error doctrine, the cumulative effect of several trial errors may be prejudicial even if they would not be prejudicial when considered individually. (*People v. Capers* (2019) 7 Cal.5th 989, 1017; *In re Reno* (2012) 55 Cal.4th 428, 483.) Because we have found either no error or harmless error, we can find no cumulative error.

## XII.  STRIKING OF ENHANCEMENTS.

McMorries argues that under SB 136, the prior prison term enhancements on his sentence imposed pursuant to section 667.5,

subdivision (b) should be stricken because his prior convictions were not for sexually violent offenses. (Welf. & Inst. § 6600, subd. (b).) Respondent agrees.

After the filing of the jury's verdict, appellant admitted the truth of the two prior prison terms alleged in the information for purposes of former section 667.5, subdivision (b). Based on this admission, at sentencing, the trial court sentenced appellant to five consecutive one-year terms on Counts 1, 3 and 13.

Effective January 1, 2020, Senate Bill No. 136 amended section 667.5, subdivision (b). (Stats. 2019, ch. 590, § 1.) By this revision, the Legislature "amend[ed] section 667.5, subdivision (b) to limit its prior prison term enhancement to only prior prison terms for sexually violent offenses, as defined in Welfare and Institutions Code section 6600, subdivision (b)." (*People v. Jennings* (2019) 42 Cal.App.5th 664, 681.)

On January 1, 2020, the effective date of Senate Bill No. 136, this appeal was pending. A statute that ameliorates the punishment for an offense will generally apply retroactively to any case in which the judgment is not yet final before the effective date of the statute. (*In re Estrada* (1965) 63 Cal.2d 740, 748.)

Accordingly, we will modify the judgment by striking the one-year prior prison term sentencing enhancements that the court imposed on Counts 1, 3 and 13 under section 667.5, subdivision (b).

## XIII.  CORRECTION OF ABSTRACT OF JUDGMENT

Appellants argue their abstracts of judgment must be modified to delete the fines and assessments shown because at the sentencing hearing, the court did not impose any such fines or fees, although the minute order and abstract of judgment

states it did so. They request that if we impose such fines or fees, that we impose the amounts reflected in the minute order, not the abstracts of judgment, and that we remand the matter for an ability to pay hearing pursuant to *People v. Duenas, supra,* 30 Cal.App.5th 1157 (*Duenas*)[12] on the court facilities and operations assessments and restitution fines imposed under sections 1465.8, subdivision (a)(1) and Government Code section 70373.

## A. Factual Background.

At the sentencing hearing, the trial court did not impose any fines or fees on appellants. The minute order of the sentencing hearing, however, reflects that it imposed the following on each of the appellants: (1) a $40.00 Court operations assessment (§ 1465.8, subd. (a)(1)); (2) a $30.00 criminal conviction assessment (Gov. Code, § 70373); (3) a $240.00 restitution fine (§ 1202.4, subd. (b)); and (4) a $240.00 parole-supervision fine (§ 1202.45).

Solorio: On each of the three abstracts, $240 each for sections 1202.4, subd. (b) and 1202.45; and $400.00 for section 1465.8 and $300 for Gov. Code section 70373.

Lopez: On each of the three abstracts, $240 each for the sections 1202.4, subd. (b) and 1202.45; and $680.00 for section 1465.8 and $510 for Gov. Code section 70373.

## B. Discussion.

---

[12] Currently, the issue addressed in *Duenas* is on review in the California Supreme Court. (*People v. Kopp* (2019) 38 Cal.App.5th 47.)

The oral pronouncement of the sentence controls over the abstracts of judgment. (*People v. Mitchell* (2001) 26 Cal.4th 181, 185.)

Government Code section 70373 and Penal Code section 1465.8, which impose court facilities and court operations assessments on every criminal conviction, each provide that the assessment "shall be imposed on every conviction for a criminal offense" except for parking offenses. (Gov. Code, § 70373, subd. (a)(1); Pen. Code, § 1465.8, subd. (a)(1).) These assessments are mandatory and non-punitive. (*People v. Fleury* (2010) 182 Cal.App.4th 1486, 1493.)

Because these fees are mandatory, the trial court's failure to impose them constituted an unauthorized sentence. We may correct an unauthorized sentence at any time, and thus these assessments may be imposed. (*People v. Barnwell* (2007) 41 Cal.4th 1038, 1048, fn.7.) However, we decline to remand to the trial court to conduct an ability to pay hearing pursuant to *Duenas, supra.* In *Duenas, supra,* 30 Cal.App.5th 1157, the court held that "due process of law requires the trial court to conduct an ability to pay hearing and ascertain a defendant's present ability to pay" before it imposes assessments under section 1465.8 and Government Code section 70373. (*Id.* at p. 1164.)

Even under *Duenas*, however, fines and fees are properly imposed if the defendant has the ability to pay them. "'"Ability to pay does not necessarily require existing employment or cash on hand." [Citation.] "[I]n determining whether a defendant has the ability to pay a restitution fine, the court is not limited to considering a defendant's *present* ability but may consider a defendant's ability to pay in the future." [Citation.] This

include[s] the defendants ability to obtain prison wages[.]'"
(*People v. Aviles* (2019) 39 Cal.App.5th 1055, 1076.)

Here, we can infer that appellants can pay the fines and
fees imposed upon them from their probable future wages,
including their prison wages. (*People v. Avilas, supra,* 39
Cal.App.5th at p. 1076.) "Prison wages range from $12 to $56 per
month, depending on the prisoner's skill level." (*Ibid.*) The state
is permitted to garnish a portion of those wages, as well as trust
account deposits, to satisfy the restitution fine. (*Ibid.*; see
§ 2085.5, subd. (a).) Appellants are serving lengthy terms, which
gives them ample time to earn sufficient funds to pay the fees.
Accordingly, we need not remand for an ability-to-pay hearing.

On the other hand, the restitution fines are intended to be,
and are recognized as, additional punishment for a crime. (See
*People v. Hanson* (2000) 23 Cal.4th 355, 362–363.) These fines are
discretionary because there are situations in which they are not
required. Subdivision (b) of section 1202.4 provides: "In every
case where a person is convicted of a crime, the court shall
impose a separate and additional restitution fine, unless it finds
compelling and extraordinary reasons for not doing so, and states
those reasons on the record." (See also *People v. Tillman* (2000)
22 Cal.4th 300, 303.) Respondent concedes that because the court
did not impose them on the record at sentencing, and the
prosecution failed to object, these fines must be stricken from the
abstracts of judgment.

## DISPOSITION

The judgment of conviction is affirmed. The judgment is
modified to strike the prior prison term enhancements imposed
pursuant to section 667.5, subdivision (b), on Counts 1, 3 and 13
as to McMorries, and the fines imposed pursuant to sections

1202.4 and 1202.45 are stricken as to all appellants. On remand, the trial court shall forward corrected abstracts of judgment to the Department of Corrections and Rehabilitation.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

                                                    CURREY, J.

We concur:

WILLHITE, Acting P.J.

COLLINS, J.